**Karen SORLUCCO, Plaintiff,**

**v.**

**NEW YORK CITY POLICE DEPARTMENT,**
**Defendant.**

**No. 85 Civ. 6895 (MBM).**

United States District Court,
S.D. New York.

Jan. 7, 1992.

Kathleen A. Sullivan, Peter A. Sullivan, Jennifer L. Zuch, Legal Interns, BLS Legal Services Corp., Brooklyn, N.Y., for plaintiff.

Robert Trachtenberg, Steven J. Rappaport, Asst. Corp. Counsel, Corp. Counsel of the City of New York, New York City, for defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

A jury awarded plaintiff, Karen Sorlucco, $264,242 in compensatory damages based on its determination that she was suspended and then fired from her job as a probationary New York City police officer as a result of sex discrimination, in violation of 42 U.S.C. § 1983.[1] Defendant, the New York City Police Department (the "Department"), has moved pursuant to Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdict or, in the alternative, for a new trial. Plaintiff sued also under Title VII, 42 U.S.C. § 2000e–2(a)(1)[2]; her claim under that statute is for the court to decide. *See Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 953 (2d Cir.1988), and cases cited therein; *but see Lytle v. Household Mfg. Co.*, 494 U.S. 545, 110 S.Ct. 1331, 1335 n. 1, 108 L.Ed.2d 504 (1990) (declining to express opinion on whether there is a jury trial right on a Title VII claim).

In connection with defendant's motion for judgment, I must consider the evidence without regard to either the credibility of the witnesses or the weight as opposed to the mere existence of evidence. *Stubbs v. Dudley*, 849 F.2d 83, 85 (2d Cir.1988). As set forth in detail below, when the record is viewed from that perspective it shows that plaintiff failed to present any evidence that an official with final authority to set policy either discriminated against her or acquiesced in a general practice of discrimination of which her suspension and firing were a part. *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989). Nor, with respect to the Title VII claim, did plaintiff show that any agent of defendant discriminated against her based on her sex. Moreover, because the evidence shows conclu-

sively that plaintiff perjured herself with respect to a material incident in the chain of events surrounding her discharge, it would be grossly unjust for the jury verdict to stand. Accordingly, the motion for judgment notwithstanding the verdict is granted and judgment will be entered for defendant on both the § 1983 claim and the Title VII claim; alternatively, the motion for a new trial is granted.

Because both parties have made detailed arguments relating to issues additional to and apart from those I find dispositive, those arguments also are treated in aid of appellate review, if necessary.

## I.

### A. *The January 1983 Incident and Sorlucco's Accounts of It*

In January 1983, plaintiff was employed by the Department as a probationary police officer assigned to a precinct in Queens. She lived in Nassau County. Plaintiff testified that on the night of January 12–13, 1983, she was held captive for six hours in her apartment, raped, and sodomized with various objects. At trial, she identified a fellow officer at the precinct as her assailant, and said that during the assault he had taken her revolver, which was lying in view and unsecured in her bedroom, and discharged it once into the mattress. She testified that a short time after the attack she found a birthday card from him under her door, and eventually found her revolver on the front seat of her car.

Plaintiff testified that on January 14, the day after the incident, she destroyed the sheets, the clothing she had worn, the birthday card and some of the objects used in the assault. According to her testimony, she also went that day to the precinct to

**1.** The statute provides, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

**2.** The statute provides in relevant part: "(a) It shall be an unlawful employment practice for an employer—(1) to ... discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...."

pick up her pay check, and was threatened with death by the officer, who told her that even if she did disclose the assault she would never be believed. (Tr. 71–78, 80, 234–35).

The next day, January 15, plaintiff set out to consult her gynecologist, but was involved in a traffic accident on the way. Her head struck the windshield. She was treated at the emergency room of a local hospital and released at her own request. (Tr. 81–83) On the afternoon of January 17, she saw her gynecologist and told him that she had been raped. He said he would have to report the assault and advised her to report it herself. (Tr. 85–86)

On January 17, following the visit to the gynecologist, she went to the Nassau County Police Department. She testified that her request to speak to a female officer was refused and that the male officer who questioned her was vulgar and abusive. (Tr. 88–89, 184) In a statement later reduced to writing and signed, she told that officer that she had been raped on the night of January 7, rather than January 13, by a male jogger she had met at a laundromat and invited to her home. According to her statement, the man had seized her gun from the bedroom, unloaded all but one bullet, and fired the remaining bullet into her mattress. The signed statement included an acknowledgment that Sorlucco had "been told that any false statements I may make are punishable as a Class A Misdemeanor pursuant to Section 210.45 of the Penal Law." (PX 1)

The Nassau County police notified the Department, and the duty officer for Queens that night, Captain John Hunt, went to the Nassau County police precinct and reviewed plaintiff's statement. He then spoke with plaintiff at her apartment. His testimony with respect to the statement was as follows:

"Q. ... [Y]ou found those details shocking. Is that right?
A. Yes, I did.
Q. And what you found so shocking was the fact that the assailant, according to the statement, had used objects on Ms. Sorlucco, is that correct?

A. That's right, according to the statement.
Q. You thought the assault, in your words, was degrading, didn't you?
A. Yes, I did.
Q. You thought the assault was so degrading you found it improbable for that reason alone to believe that it happened, didn't you?
A. I did have difficulty believing it, yes.
Q. You found it hard to believe that one person would do that to another, didn't you?
A. That's right.
Q. And that's why you found the whole thing a little improbable, is that right?
A. I didn't say it was improbable. I said I thought it was a horrible incident, and—and I couldn't believe anybody perpetrating an assault like that on an individual."

(Tr. 603–03) From this testimony plaintiff argued at trial, and argues now, that from the outset Hunt disbelieved her account.

Based on Sorlucco's distraught emotional condition and her failure to report the discharge of her weapon ten days before—as her account then was—Hunt placed Sorlucco on modified assignment, a duty status within the Department calling for non-patrol assignments and surrender of the officer's weapon. (Tr. 600) He reported the matter to the Department's Internal Affairs Division and recommended that charges and specifications be drawn against plaintiff for failing to safeguard her weapon and failing to report the incident promptly. (Tr. 601)

On January 18, the day after her initial signed statement, she gave another signed statement to the Nassau County police, this time to a female officer. The January 18 statement reiterated the substance of the January 17 statement, and added that she had found a birthday card from her assailant under her door and had destroyed it. The last page of the signed statement included the following:

"I am giving this statement to a detective who is writing it down for me. I have been advised that any false state-

ment given herein is punishable as a Class A misdemeanor pursuant to Section 210.45 of the Penal Law. The above is the truth to the best of my knowledge."

(PX 2) The following day, January 19, she met with Dr. Eloise Archibald, a Department staff psychologist, and repeated her earlier accounts of the assault. (Tr. 329) Archibald suggested that Sorlucco consult an outside therapist, but plaintiff said she wished to consult Archibald who, after conferring with a supervisor within the Psychological Services Division, agreed. (Tr. 333)

On January 21, after speaking with friends and family, plaintiff again went to the Nassau County police and gave yet another statement. In this statement she said she had been assaulted not by an unknown assailant she had met at a laundromat but by a fellow officer, John Mielko, and that the assault had occurred not on January 7 but on January 13–14. The Nassau County police then notified Sergeant Carmine LaCava, of the Department's Field Internal Affairs Unit, about the allegation against Mielko. LaCava testified that he did not interview Mielko at that time because Nassau County was investigating the incident. "The decision was made to wait until Nassau County completed their criminal investigation, and then we would do our investigation when they completed theirs." (Tr. 524–25)

Records introduced at trial showed that Mielko told Nassau County police he had gone to plaintiff's apartment on the night of January 13 at her invitation, and that they had had sexual relations, but that there had been no rape and no sodomy. Those records showed that on January 26, Mielko voluntarily took a polygraph examination administered by the Nassau County police, and passed. (DX T) Sorlucco testified that on February 1 she too took a polygraph test. Although a copy of Mielko's test was in the file that Nassau County turned over to the Department, a copy of Sorlucco's was not. However, Sorlucco testified that the Nassau County police examiner asked her five or six questions unrelated to the incident, "[a]nd then all of a

sudden he started jumping up and screaming to me that I was a liar, that I failed, I didn't deserve to be a cop. All sorts of things, like a maniac." (Tr. 109) She testified that the next day she was tested—twice—by a privately retained polygraph expert and passed. (Tr. 109–110)

There was introduced into evidence a statement apparently signed by Sorlucco on February 1, the day of the Nassau County police polygraph test, withdrawing all charges against Mielko; the statement was witnessed by Lieutenant Eugene Dolan of the Nassau County Police Department. (DX U) Dr. Archibald's records showed an entry for February 1 that included the following:

> Telephone contact w/[ith] P[robationary] P[olice] O[fficer] [Sorlucco] who was upset & crying because polygraph tests, taken earlier that day, suggested she was lying & her accused assailant was telling the truth. Bec[ause] of results of polygraph she dropped charges & Nassau Cty has closed case.

(DX Y) The psychologist's testimony was to the same effect:

> ... I believe it was February 1st, 1983, when we had a telephone contact; and at that time, she was very upset because of a polygraph test that she had taken that day. In any case, at one point in the conversation, she said that because of the results of the polygraph, she had dropped her charges, and Nassau County had closed the case.

(Tr. 337) Dr. Archibald testified that it was her procedure to take notes contemporaneously with conversations so as to record the content of those conversations. (Tr. 325) The notes in question were received in evidence without objection as business records (Tr. 336–37), and their contemporaneous recordation was never challenged at trial. Plaintiff's current suggestion that the jury might have found the notes were not contemporaneously recorded or were otherwise inaccurate is not supported by so much as a line of testimony and conflicts directly with the testimony

and the contemporaneous record of the psychologist.

Plaintiff's testimony on cross-examination about the statement withdrawing the charges warrants extensive quotation:

Q. I'd like to show you what's been marked as defendant's U for identification, and ask you to read that to yourself, please.

A. (Pause)

Q. Have you finished?

A. Yes, sir.

Q. That's your signature at the bottom?

A. Yes, it is.

Q. And this is a statement that you signed on February 1st, correct? Right?

A. No, it's not.

Q. It's not the statement that you signed?

A. No. The paper I signed was a blank piece of paper when I signed it.

Q. Oh, yeah? And you just signed a blank piece of paper?

A. I was told I'd lose my job if I didn't sign that piece of paper.

MR. TRACHTENBERG: Your Honor, could I have a court's direction to answer the question?

THE COURT: His question was: Did you sign a blank piece of paper?

THE WITNESS: Yes, I did.

BY MR. TRACHTENBERG:

Q. Did you understand what you were signing when you signed a blank piece of paper?

A. I understood I had to sign the piece of paper.

Q. Did you understand what the purpose was of signing a blank piece of paper?

A. Not to lose my job.

Q. Did you understand what the effect of signing the blank piece of paper would be?

A. Not to lose my job.

Q. Did Lieutenant Dolan tell you what he was going to do with that piece of paper?

A. He told me I'd lose my job if I didn't sign that piece of paper.

Q. Did he tell you anything else?

A. No, he did not.

Q. He did not tell you you were withdrawing your criminal complaint against—

A. No, he did not tell me that.

Q. Didn't you testify on direct that you were told that if you didn't sign this piece of paper withdrawing your criminal complaint against Officer Mielko, you could lose your job?

A. That's how my attorney worded the question, but we are also aware that I signed a blank piece of paper.

Q. That's fine. I understand that. You have answered your attorney's question that way because it was the truthful answer, correct?

A. No, I signed a blank piece of paper. I answered my attorney's question the way he approached me with it. If he asked me the question incorrectly, then perhaps I answered incorrectly, but I signed a blank piece of paper.

Q. So, in other words, on February 1st, you didn't know that you were withdrawing your criminal complaint?

A. No, I did not.

(Tr. 187–89)

As set forth above, Dr. Archibald's contemporaneous record and her testimony showed that plaintiff had revealed accurately to the doctor on February 1 the contents of the statement withdrawing the charge against Mielko; yet Sorlucco claimed at trial that on February 1 she signed a blank piece of paper the effect of which she did not then know. Although Sorlucco was asked whether she had told the doctor on February 1 about withdrawing the charges because of the polygraph results, and said she did not believe she had (Tr. 189–90), she was never asked during her own testimony how or whether she could explain the doctor's notes, which were introduced as part of the defense case.

Plaintiff was confronted with her own prior testimony about the polygraph examinations, as follows:

Q. .... You said on direct that Nassau County asked you—the Nassau examiner

asked you five or six, what you described as totally unrelated questions, unrelated to the incident. And then the examiner jumped up and—and told you that you had failed, correct?

A. That's correct.

Q. And I want to refer to the testimony that you gave at the 50(h) hearing, page 52. Before I do that, I just want to ask a couple other questions. You then went the next day and got a private polygraph exam taken, correct?

A. That's correct.

Q. And that examiner asked you what you believed were much more pertinent questions to the incident, correct?

A. That's correct.

Q. Now, okay. I want to go back to paragraph—to page 52 of your 50(h) testimony. Do you recall being asked this question and giving this answer:

"Did he"—and counsel can correct me if I'm wrong, referring to the private polygraph examiner.

"Did he ask you exactly the same questions as Nassau County did?

"A. Asked me more detailed questions. It was basically the same questions."

Do you recall giving that question—being asked that question and giving that answer?

A. No, I don't. But I know that—

Q. Excuse me. Just answer my question.

THE COURT: The question is, Did you give that answer to that question?

THE WITNESS: I didn't say that.

THE COURT: You didn't say that.

THE COURT: No, I did not.

THE COURT: So the transcript is wrong.

THE WITNESS: That's correct.

(Tr. 190–91) Counsel then elicited from plaintiff that she had had an opportunity to make corrections in the transcript from which he had questioned her, that she had in fact made corrections, and that she had not proposed any corrections to the cited testimony. (Tr. 192–93) In response to defendant's post-verdict motion for a new trial, plaintiff has proffered another section of the same transcript to show that at a different point in that earlier testimony plaintiff did say that the Nassau County polygraph examiner had asked questions irrelevant to the assault, rather than merely having asked general questions that were " 'basically the same' " as those asked by her retained polygraph examiner. (Tr. 191) The point of this later proffer was to show that at least part of plaintiff's earlier testimony was consistent with her trial testimony, and that she cannot be said to have changed her story at trial.

### B. *The Department's Investigation*

The evidence showed that the Internal Affairs Division questioned Sorlucco for the first time about her rape charges in June, questioned most potential witnesses by telephone, and did not question Mielko until September, after Sorlucco had already been dismissed. Plaintiff argues that the difference between the way the charges against her were treated and the way her charges against Mielko were treated, is evidence that her suspension and dismissal resulted from discrimination. Defendant responds that LaCava had a perfectly acceptable reason for not pursuing immediately an investigation of Sorlucco's charges: the pendency of the Nassau County criminal investigation of Sorlucco and the understandable desire to avoid conducting interviews that would not only duplicate but also potentially interfere with the Nassau County investigation. (Tr. 524–25; *see* p. 206, *supra*)

LaCava's stated reason for not conducting an immediate investigation—the pendency of the Nassau County inquiry—is undermined somewhat by evidence that Nassau County agreed as early as February 17 that the Department could interview potential witnesses. (PX 19 at p. 16) However, before that agreement, on January 26, LaCava learned from the Nassau County police that Mielko had passed a lie detector test when he denied plaintiff's accusations. (DX T) Thereafter, on February 1, plaintiff signed a statement withdrawing her charge against Mielko (DX U), the substance of which was conveyed by the Nas-

sau County police to LaCava in a telephone conversation on February 2. (DX W) Even at the time Sorlucco initially accused Mielko, on January 21, 1983, Lieutenant Eugene Dolan of the Nassau County Police Department told LaCava he did not anticipate any action being taken against Mielko until Sorlucco's statements could be investigated. (DX Q) LaCava testified that he was waiting for the Nassau County file before conducting interviews, and did not receive the file until May. (Tr. 533)

## C. *Sorlucco's Prosecution, Suspension and Termination*

In April 1983, the Nassau County District Attorney decided to prosecute Sorlucco for making false statements and obstructing governmental administration based on the two sworn statements on January 17 and 18, which were later retracted when she accused Mielko, an accusation that was itself subsequently withdrawn. Sorlucco was arrested on those charges on May 23, 1983, at which time she was suspended by LaCava and another officer, acting for the Department. (Tr. 115; PX 19) Thereafter, departmental charges and specifications were filed, mirroring the criminal charges and adding a charge of failure by Sorlucco to safeguard her weapon. Another Department officer, Sergeant Paul Massucci, head of the Department's Employee Management Division/Probationary Evaluation Unit, consulted with his supervisor and recommended that Sorlucco's employment be terminated because of the pending criminal charges and the alleged failure to safeguard her weapon. (Tr. 373–74; DX CCC) That recommendation eventually was approved by the Police Commissioner and plaintiff's employment was terminated effective July 15, 1983. (PX 16)

Defendant points out that those involved in the departmental investigation of Sorlucco and the charge she raised against Mielko were not involved in the decision to suspend and fire her, and vice versa. Therefore, defendant reasons, any discrepancy in the treatment of Sorlucco and Mielko, even assuming it was due to discrimination, cannot have led to the injury for which Sorlucco sues. Although Massucci, one of those

who recommended that Sorlucco be fired, was aware of the departmental inquiry, and LaCava, who conducted that inquiry, had notified Sorlucco of her suspension when Nassau County filed charges against her, that appears to be the only connection between the allegedly tainted inquiry and the decision to fire Sorlucco. That decision was recommended by the Employment Management Division/Probationary Evaluation Unit, to which Massucci was assigned, and was not passed on by the Internal Affairs Unit, to which LaCava was assigned. Moreover, as defendant points out, Massucci testified he was unaware of Sorlucco's charge against Mielko. (Tr. 380, 387) Defendant argues, therefore, that the decision to fire Sorlucco cannot be related to any discriminatory motivation in the Department's investigation of Sorlucco's charge.

In response, plaintiff cites a segment of Massucci's cross-examination testimony to the effect that he had assumed Sorlucco's charge of rape was false (Tr. 381), that he did not review the investigative file even though he knew there was such a file (Tr. 383), and that he had not consulted or requested records of Archibald's counseling unit, even though he was aware plaintiff might have been counseled in connection with her rape allegation. (*Id.*) From this, she argues a jury might conclude that those who recommended her dismissal dismissed the possibility that she had a defense to the charges against her, and did so because she was a woman.

However, Massucci was aware as well that she had been charged in Nassau County with making false statements and obstructing governmental administration. (Tr. 385–86) Further, as Massucci testified, when he recommended her termination he was aware of departmental charges relating to (i) the false statements she allegedly made to the Nassau County police, (ii) the criminal prosecution pending against her as a result, and (iii) her failure to safeguard her weapon. (Tr. 386; *see also* DX QQ (listing the five charges and specifications filed against Sorlucco on May 23, 1983))

The dismissal recommendation itself was made in a memorandum that was approved by several supervisors before the Police Commissioner accepted the recommendation and authorized Sorlucco's dismissal. (DX CCC) The memorandum cited the four departmental charges of false statements arising from Sorlucco's reports of the assault to the Nassau County police, and one charge that she had failed to safeguard her weapon. Nowhere does the memorandum betray any suggestion of sex discrimination, nor was any evidence introduced to show that the Police Commissioner was aware of any such discrimination in this case or practiced any himself in approving the Sorlucco's dismissal.

In aid of showing that Sorlucco was fired as part of a policy or practice of discrimination, plaintiff introduced evidence that during the five years 1980–1985, 47 probationary officers were arrested. Of those, 12 resigned. Of the remaining 35, four were women and 31 were men. Of those 35, nine—all of them men—were restored to duty. All four women among the arrested probationary officers who had not resigned, and 22 men, were fired. Plaintiff in this case was one of the four.

Generally, the cases of the nine men who were restored to duty after having been arrested during their probationary period involved less serious charges, or circumstances more strongly suggesting actual innocence, than the cases of the four women who were fired. For example, one male probationary officer was arrested for driving while intoxicated after being involved in accident in which another automobile was damaged but no one was injured. He pleaded guilty to driving while impaired. In addition to the penalty for that offense, he forfeited 30 days' vacation his probationary period was extended for 12 months. (Tr. 665) By contrast, one female probationary officer was terminated after being arrested for driving while intoxicated following an accident in which one person was killed.

Another male probationary officer was arrested for child molestation, but was permitted to resume his career two years later when it turned out that his accuser rather than he was guilty of the offense. (Tr. 658–59) Another of the female probationary officers was arrested for shoplifting, and also for harassment after she allegedly punched a store detective when he confronted her over the shoplifting incident. Although she was acquitted of the shoplifting, she was convicted of the harassment. (Tr. 669)

The arrest of another of the terminated female probationary officers for defrauding a supermarket was voided, although that same officer was the subject of departmental charges for assault during an off-duty altercation. (Tr. 667–68) The fourth female probationary officer terminated following an arrest was Sorlucco.

## II.

The prerequisites for municipal liability under the federal civil rights laws established in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) were elaborated and defined in three later cases: *Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988); and *Jett v. Dallas Independent School District, supra*. *Monell* established that § 1983 liability cannot be fixed on local governments based on *respondeat superior;* however, local governments can be held liable for violations of that statute which result from official policy or custom. 436 U.S. at 694, 98 S.Ct. at 2037. The Court in *Monell* defined such an official policy as a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a municipal governing] body's officers." *Id.* at 690, 98 S.Ct. at 2036. It defined a less formal "custom" as " 'such practices of state officials ... [as are] so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Id.* at 691, 98 S.Ct. at 2036 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970)). The Court held that "it is when execution of a government's policy or custom, wheth-

er made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible." *Id.* at 694, 98 S.Ct. at 2037.

■ Without getting further into the tangle of plurality and concurring opinions in *Pembaur* and *Praprotnik* than is necessary to decide this case, it will suffice to say that certain of the views expressed in *Pembaur* and *Praprotnik* achieved majority status in *Jett*, where the Court defined a two-step process for imposing municipal liability under § 1983. First, the district court must identify the officials or governmental entities that have final policy making authority for the municipality in question by "reviewing the relevant legal materials, including state and local positive law, as well [as] ' "custom or usage" having the force of law.' " 109 S.Ct. at 2723 (citation omitted). Second, once that legal decision is made, the jury must decide whether the officials or entities so identified have "caused the deprivation of rights at issue by policies which affirmatively command that it occur or by acquiescence in a longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Id.* (citation omitted). Thus, whether a plaintiff claims to have been injured by an explicit policy or by a more general practice or custom, that plaintiff must prove a conscious act of discrimination by the relevant policy maker. In other words, plaintiff must prove active adoption of the discriminatory policy, or passive but nonetheless conscious acquiescence in the discriminatory practice or custom. As the plurality wrote in *Pembaur,* "municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." 475 U.S. at 483–84, 106 S.Ct. at 1300. The Court of Appeals for the Third Circuit recently has described this as a requirement that a plaintiff "adduce scienter-like evidence." *Simmons v. The City of Philadelphia,* 947 F.2d 1042, 1065 (3rd Cir.1991).

The parties to this case dispute heatedly whether the Police Commissioner is the relevant policy maker. Defendant insists he is not but rather that the City's Personnel Director is, citing New York State's Civil Service Law, which directs municipal civil service commissions to "provide by rule for the conditions and extent of probationary service," N.Y. Civil Service Law § 63, par. 2 (McKinney 1983), and New York City's Charter in effect at the time, which gives the City's Personnel Director "all the powers and duties of a municipal civil service commission," with exceptions not relevant here. N.Y.C. Charter § 811. The Personnel Director has provided by rule that agency heads may terminate probationary employees at or before the end of their probationary periods only on notice to him, Rule 5.2.7(a) and (c), and such certification must recite that the termination conforms with all rules of the Civil Service Commission, the City Charter and Personnel Director. N.Y.C. Charter § 814(d). The Personnel Director is empowered to "reverse or rescind any agency personnel action or decision pursuant to an assignment or delegation of authority in this chapter upon a finding of abuse...." N.Y.C. Charter § 813(b)(4). Defendant cites at least one case in this District which suggests that the Personnel Director rather than the Police Commissioner is the relevant policy maker for the purpose of determining potential municipal liability for a civil rights violation. *Davis v. The City of New York,* 55 Empl.Pract.Dec. 40,346, 1990 WL 165763 (S.D.N.Y.1990).

Plaintiff argues that the Police Commissioner has *de facto* power to terminate probationary employees, that such terminations in fact are not reviewed by the Personnel Director, and that there is authority in six other circuits for treating agency heads and police commissioners as policy makers whose actions may precipitate municipal liability. *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1481 (3d Cir.1990) (police commissioner); *Crowder v. Sinyard,* 884 F.2d 804 (5th Cir.1989) (police chief), *cert. denied,* ___ U.S. ___, 110 S.Ct.

2617, 110 L.Ed.2d 638 (1990); *Zook v. Brown,* 865 F.2d 887 (7th Cir.1989) (county sheriff); *Williams v. Butler,* 863 F.2d 1398 (8th Cir.1988) (municipal judge), *cert. denied,* 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 565 (1989); *Starrett v. Wadley,* 876 F.2d 808, 818–19 (10th Cir.1989) (county assessor); *Flanagan v. Munger,* 890 F.2d 1557, 1568–69 (10th Cir.1989) (police chief); *Mandel v. Doe,* 888 F.2d 783, 794 (11th Cir.1989) (physician's assistant); *Lucas v. O'Loughlin,* 831 F.2d 232, 234–35 (11th Cir.1987) (county sheriff), *cert. denied,* 485 U.S. 1035, 108 S.Ct. 1595, 99 L.Ed.2d 909 (1988). Plaintiff cites also one case within this Circuit, *Rookard v. Health & Hospitals Corp.,* 710 F.2d 41, 45 (2d Cir.1983), albeit one that antedates *Pembaur, Praprotnik* and *Jett* and whose vitality defendant therefore questions. *But see Haynesworth v. Miller,* 820 F.2d 1245, 1272 n. 227 (D.C.Cir.1987) (a post-*Pembaur* case citing *Rookard* for the proposition that an official with final authority in the relevant sphere makes the municipality's final decisions).

■ I need not resolve this dispute, however, because even if the Police Commissioner is the relevant policy maker, there was simply no evidence from which a jury could have inferred that he discriminated against plaintiff based on her sex, either in this case or as part of a pattern or practice of discrimination. The only evidence of the Police Commissioner's involvement in the decision to fire plaintiff is a two-page memorandum describing her placement on modified assignment on January 17, 1983, her suspension on May 23, 1983 after she was arraigned on the Nassau County information, and the filing of the five departmental charges described above. (DX CCC) The memorandum ends with the recommendation of four superior officers that Sorlucco be fired, and an endorsement reflecting that the Police Commissioner approved the recommendation. The only paragraph of the memorandum that describes anything other than her employment status or the charges against her is the following:

   2. Particulars of Modified Assignment: On January 17, 1983, P.P.O. Sorlucco entered Nassau County Precinct # 5 to report that she had been sexually abused at her residence by an unidentified male, who also fired one (1) shot from her service revolver into her mattress. The male who had been invited to P.P.O. Sorlucco's residence then fled. This incident took place on January 7, 1983 at about 2330 hours (report attached).

It is impossible to discern how a jury could have concluded from that paragraph or anything else in the memorandum that the Police Commissioner made a sexually biased decision when he approved the recommendations to fire plaintiff.

■ Nor is it possible that the jury could have concluded rationally that Sorlucco's dismissal was part of a pattern or practice of discrimination. Not only are the cases of the four women who were fired during their probationary period different from the cases of the nine men so dismissed, but also the sample is statistically insignificant. As the Supreme Court wrote in *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 338, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977), a party alleging a civil rights violation must "prove more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts. It [must] establish by a preponderance of the evidence that ... discrimination was the [defendant's] standard operating procedure—the regular rather than the unusual practice." Comparing four dismissals of women to nine dismissals of men, over a period of five years, could not show that the Police Commissioner was engaged in a pattern or practice of discrimination. *Haskell v. Kaman Corp.,* 743 F.2d 113, 121 (2d Cir.1984); *Ingram v. Madison Square Garden Center, Inc.,* 709 F.2d 807, 810 (2d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 346, 78 L.Ed.2d 313 (1983); *Wolfe v. Time, Inc.,* 702 F.Supp. 1045, 1049–50 (S.D.N.Y. 1989); and cases cited therein.

Because no rational jury could have found discrimination by the Police Commissioner—the only decision maker whose actions could have imposed liability on this municipal defendant even on the legal theory most favorable to plaintiff—the jury verdict must be set aside and judgment

entered in favor of defendant on the § 1983 claim.

### III.

■ Plaintiff has sought recovery also under Title VII, 42 U.S.C. § 2000e. Two distinctions between Title VII and § 1983 are relevant for purposes of considering the Title VII claim. The first such distinction is that under the statute in force at the time the case was tried, sex discrimination claims under Title VII were to be tried to the court and not to a jury. The second is that agency principles are applied under Title VII for purposes of deciding whether a municipality is liable. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). Thus, if members of the New York City Police Department other than the Commissioner were found to have discriminated against plaintiff based on sex, and to have acted within the scope of their agency notwithstanding any policy of non-discrimination adopted by the Department, defendant could be held liable.

■ As to the first of these distinctions, plaintiff has urged that an amendment to the statute effected by § 102(c) of the Civil Rights Act of 1991 (the "1991 Act"), providing for jury trials in Title VII cases, should be applied retroactively such that the jury verdict in this case would impose Title VII liability on defendant. Plaintiff's position must be rejected for at least two reasons. First, although the issue of whether the 1991 Act applies to cases filed before its effective date is already the subject of at least one split of authority, *compare Mojica v. Gannett Company, Inc.*, 779 F.Supp. 94 (N.D.Ill.1991) (applying the 1991 Act to case already pending), *with Van Meter v. Barr*, 778 F.Supp. 83 (D.D.C. 1991) (declining to apply the 1991 Act to a case already pending), neither authority nor common sense suggests that the amended statute should be applied to a case not merely pending, but already tried on the assumption that the Title VII issues would be decided by the court. Even Supreme Court authority supporting the principle that "a court is to apply the law in

effect at the time it renders its decision," *Bradley v. Richmond School Board*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), recognizes an exception when manifest injustice would result. *Id.* at 716, 94 S.Ct. at 2019. Injustice certainly would result from denying to defendant retroactively the right to be aware that plaintiff's Title VII claim would be decided by the jury and to frame its defense and fashion its arguments accordingly. Therefore, there is no need to resolve the tension between the quoted principle from *Bradley* and later authority such as *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988), suggesting that substantive legislation is not to be given retroactive effect absent clear terms in the statute requiring such effect. That tension was recognized but not resolved by the Court in *Kaiser Aluminum & Chemical Corp. v. Bonjorno*, 494 U.S. 827, 110 S.Ct. 1570, 1576–77, 108 L.Ed.2d 842 (1990). Here, *Bradley* itself, and authority in this Circuit reading *Bradley* narrowly as "an instruction to the appellate courts to adjudicate cases pending on direct appeal according to the law then in effect," *Litton Systems, Inc. v. American Telephone and Telegraph Co.*, 746 F.2d 168, 171 (2d Cir.1984), make it clear that the 1991 Act should not be applied retroactively to this case.

■ The second reason why the jury verdict on the § 1983 claim cannot be applied to the Title VII claim is that the jury did not make any findings applicable to the Title VII claim. Ordinarily, when an action involves legal and equitable claims with common issues of fact, the legal claims must be tried by a jury, and the jury's factual determinations are binding on the court. *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). The same principle applies to actions under § 1983 and Title VII. *Wade*, 844 F.2d at 954; *cf. Lytle*, 110 S.Ct. at 1335–38. The jury in this case, however, was asked at most to decide whether the Police Commis-

sioner had discriminated. To the extent its verdict may be read as reaching any further, which in any event would call for some speculation, such a verdict would be advisory only. Advisory verdicts are not binding as to factual issues to be tried to the court. *(American) Lumbermens Mut. Cas. Co. v. Timms & Howard, Inc.,* 108 F.2d 497, 500 (2d Cir.1939).

■ Plaintiff's Title VII claim is without substance. At the time plaintiff was placed on restricted duty and then dismissed, LaCava was aware that plaintiff had withdrawn her charge against Mielko after failing a lie detector test (DX W) and, by her own admission, had failed to safeguard her weapon. Moreover, at the point when plaintiff first accused Mielko, she had already accused another person and had delayed reporting the incident. Although an impartial observer at that point might have believed it was possible that Sorlucco's conduct was due to rape trauma syndrome, the circumstances were sufficiently equivocal that no discrimination can be inferred from the failure to place Mielko on restricted duty as soon as Sorlucco accused him. This conclusion is bolstered by the view expressed to LaCava by Lieutenant Dolan of Nassau County that no action against Mielko was anticipated until Sorlucco's statements could be investigated. (DX Q) Unlike Sorlucco, Mielko both was a tenured officer and had displayed no inability to function in his job.

The Department's failure to interview witnesses before February 1983 was consistent with the basic law enforcement practice of assuring that witness interviews in an administrative proceeding are not conducted in such a way as to duplicate and potentially interfere with an ongoing criminal investigation. (Tr. 524–25) It does not give rise to an inference of discrimination. Thereafter, insofar as the case involved charges against Mielko it hardly appeared to warrant urgent activity. The Department was informed that Mielko had passed a polygraph test when he denied Sorlucco's accusation (DX T), that she had

failed such a test, and that she had signed a statement in Nassau County withdrawing her charge against Mielko. (DX W) It was no act of sex discrimination not to have conducted an urgent investigation targeted on Mielko after February 1983.

Sorlucco was dismissed during a period in her career in which she was still a probationary officer. The dismissal was based on five charges of misconduct, including four arising from her contradictory statements to the Nassau County police that were the subject of pending criminal charges in Nassau County, and one based on her failure to take an elementary precaution designed to avert potentially disastrous results: to safeguard her weapon. Massucci, who initially recommended her dismissal, testified he was unaware at the time that she had made any accusation against Mielko (Tr. 380, 387), and nothing in the record contradicts that testimony. I can draw no inference of discrimination from the dismissal of a probationary officer in these circumstances.

For those reasons, plaintiff's Title VII claim must be dismissed and judgment entered for defendant.

## IV.

■ Defendant has moved alternatively for a new trial. One ground suggested by the Court and briefed by the parties, Fed. R.Civ.P. 59(d), is Sorlucco's sworn denial that she knowingly signed a statement withdrawing her rape and sodomy charges against Mielko, and her insistence that she was made to sign a blank piece of paper and did not know the day she signed it what text had been placed on it after she affixed her signature.[3] That testimony, quoted above, cannot conceivably have been truthful. Dr. Archibald, a Police Department psychologist, testified based on her notes that Sorlucco told her on February 1 that she had failed the polygraph examination and had "dropped her charges" against Mielko. (Tr. 337) The psychologist had no demonstrated or even plausible motive to lie.

---

**3.** Another ground suggested by the Court was Sorlucco's tergiversation about the polygraph

examination administered by Nassau County. *(See* pp. 207–208, *supra )*

The question of whether Sorlucco knowingly signed a statement withdrawing her charges against Mielko goes directly to the question of whether those charges were true. Her sworn denial that she knowingly signed that statement raises the strong inference that she perjured herself on that critical issue. Sorlucco argued at trial that her initial statements to the Nassau County police implicating an unidentified jogger instead of Mielko had resulted from rape trauma syndrome, one type of post-traumatic stress disorder, which manifested itself in her inability to discuss the details of the assault soon after it occurred. She presented an expert who testified that her behavior and those initial statements were consistent with that psychological phenomenon. (Tr. 436–38, 441, 473–74; PX 40) However, she maintained that she had then identified her assailant truthfully as Mielko and that the difference between the way the Department dealt with her and the way it dealt with Mielko gave rise to an inference of discrimination.

■ In *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978), the Court of Appeals in this Circuit approved and adopted the standard described in *Moore's Federal Practice* for deciding a new trial motion, as follows:

> The trial judge, exercising a mature judicial discretion, should view the verdict in the overall setting of the trial; consider the character of the evidence and the complexity or simplicity of the legal principles which the jury was bound to apply to the facts; and abstain from interfering with the verdict unless it is quite clear that the jury has reached a seriously erroneous result. The judge's duty is essentially to see that there is no miscarriage of justice. If convinced that there has been then it is his duty to set the verdict aside; otherwise not.

*See* J.W. Moore and J.D. Lucas, 6A *Moore's Federal Practice*, ¶ 59.08[5], at 59–150–59–152 (1991). A verdict based on perjury is one example of the injustice to be avoided through the grant of a new trial, if necessary. *Isley v. Motown Record Corp.*, 69 F.R.D. 12, 16–17 (S.D.N.Y.1975); *cf. Chambers v. Nasco, Inc.*, —— U.S. ——, 111 S.Ct. 2123, 2132, 115 L.Ed.2d 27 (1991) (noting a federal court's inherent power to set aside a judgment upon proof that a fraud has been perpetrated upon it).

Two of plaintiff's arguments on this point warrant mention if not extended discussion. The first is simply that it is impossible to conclude with certainty that she was lying when she denied at trial that she knowingly signed a statement withdrawing the charges against Mielko; she may have believed her testimony was true. The problem with that argument is that it is simply fanciful; not even the testimony of plaintiff's rape trauma expert went so far as to suggest that that syndrome would have led plaintiff to deny at trial what she had acknowledged in 1983 to a psychologist about an event that was not a part of the underlying trauma. (Tr. 457, 469) There is no evidence to support plaintiff's theory; there is overwhelming evidence in the form of Dr. Archibald's notes and her testimony to support the opposite conclusion.

Plaintiff suggests also that it is irrelevant whether plaintiff lied about knowing she signed a statement withdrawing her charges against Mielko, an event plaintiff pronounces "completely immaterial to the core issues at trial." (Pl.Mem. Pursuant to Fed.R.Civ.P. 59(d), p. 8.) Plaintiff urges that *"[t]he jury's verdict finding defendant liable was not based on Ms. Sorlucco' testimony regarding ... the signing of the blank piece of paper but was based on the discriminatory treatment suffered by Ms. Sorlucco."* *Id.* at 7–8 (emphasis in original). In a sense, plaintiff is correct; but in no sense is she right. To be sure, discrimination or its absence turns on a defendant's state of mind, not on a plaintiff's. Theoretically, if a defendant acted for discriminatory reasons, plaintiff's state of mind would have no bearing on whether discrimination occurred. However, such reasoning, extended as plaintiff urges, would permit this plaintiff to recover even if the charges against Mielko were false, the issue on which the testimony in question bears directly. That, in turn, would mean that a statute created to redress injury from discrimination would allow a plain-

tiff to use a false accusation as the occasion for testing the purity of a defendant's motivation, even if the "injury" plaintiff suffered was no more than was justified by the truth. To read this statute in that way would be to permit not simply an ordinary injustice such as a verdict against the weight of evidence, but an exquisite refinement of injustice.

I believe the Court of Appeals at least implicitly declined in this case to read the statute in the way plaintiff suggests when it reversed a summary judgment for defendant and held that "[i]t is for a jury to determine whether Sorlucco's charges against Mielko were true and, *if so*, whether the discipline meted out to her was unlawfully disparate to that received by her male fellow officer." *Sorlucco v. New York City Police Dep't.*, 888 F.2d 4, 8 (2d Cir.1989) (emphasis added). If not, the discipline presumably was not unlawfully disparate. But whether or not Sorlucco's argument was rejected implicitly in the earlier Court of Appeals opinion, it is rejected explicitly now in this Court for the reasons stated above.

\* \* \*

To summarize: Defendant's motion for judgment notwithstanding the verdict with respect to plaintiff's § 1983 claim is granted; judgment will be entered as well for defendant on plaintiff's Title VII claim. Alternatively, defendant's motion for a new trial on plaintiff's § 1983 claim is granted. To the extent the above opinion determines plaintiff's Title VII claim, it will constitute my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

SO ORDERED.