Catherine E. MALARKEY, Plaintiff,

v.

TEXACO, INC., Defendant.

No. 81 Civ. 5224 (MBM).

United States District Court,
S.D. New York.

May 12, 1992.

Denny Chin, Ellen A. Harnick, Vladeck, Waldman, Elias & Engelhard, P.C., New York City, for plaintiff.

Paul M. Brown, Elizabeth A. Alcorn, Whitman & Ransom, New York City, for defendant.

## AMENDED OPINION AND ORDER

MUKASEY, District Judge.

After more than a decade of bitter litigation, plaintiff secured a jury verdict based on a finding that although defendant Texaco, Inc. did not discriminate against her on the basis of age, it did willfully retaliate against her for charging discrimination. The jury found damages in the amount of $65,000, which was then doubled to $130,000 based on the finding of willfulness. Now before the court is defendant's motion for judgment notwithstanding the verdict, and plaintiff's motions for prejudgment interest, equitable relief and attorneys' fees.

For the reasons set forth below, defendant's motion is denied, plaintiff's motions for prejudgment interest and equitable relief are granted, and attorneys' fees are awarded in the amounts and to the firms specified in section IV of this opinion.

### I.

Texaco argues that there was no evidence to support: (1) the jury's finding that Texaco's failure to promote plaintiff to executive secretarial positions ultimately awarded in 1981 to Norma Cavanaugh and in 1983 to Eleonore Coronel resulted from retaliation; (2) the jury's finding of willfulness; and (3) the jury's $65,000 damage award. To the contrary, the jury's verdict appears to have been based on a sensible and perceptive evaluation of the evidence.

Texaco would have me focus only on the two employment decisions at issue, without regard to the ample evidence in the record that by 1981 plaintiff was widely regarded as *persona non grata* at Texaco because of her complaints about the company's employment practices, and the apparent effect of that view on those two decisions. Plaintiff testified that beginning in 1975, when she worked in the personnel department, she complained to Texaco management about the difficulty she had placing older secretaries within the company and the apparent preference of executives for younger and physically attractive secretaries. Eventually, she wrote a memorandum on the subject. (Tr. 62–69; PX 84) Plaintiff testified that she was then forced out of the personnel department, and into a job as secretary to Robert McCay, a Texaco vice president, at a lower salary grade than she believed was appropriate in view of her grade while she was employed in the personnel office. (Tr. 69–75) Based on plaintiff's testimony and the supporting evidence, the jury could have concluded that after plaintiff's removal from the personnel department she was demoted in pay grade, and began a slide that took her from one of the four highest paid secretaries in the company to one whose salary level lagged behind that of recent hires and who went for long periods with little or no work. (Tr. 57–67, 70–71, 96–98, 102–03, 107, 118–19, 122–23, 403–06, 429–34, 591, 918; PX 84, 115)

In or about March 1980, McCay was promoted to a position that warranted an office on the executive floor at Texaco, and did not choose plaintiff as his secretary. (Tr. 82–84) In 1980, she filed a discrimination charge with the EEOC based on Texaco's failure to promote her to an executive secretarial position, and this lawsuit followed in 1981.

Harry Matthews, a retired Texaco employee, testified that after McCay's promotion, which occurred in the spring of 1980, he tried to help plaintiff get a job by talking to Carl Davidson, corporate Secretary of Texaco and a person so frequently involved in placing executive secretaries as to be known among Texaco employees as the "queen maker." (Tr. 89, 93) Davidson's role was particularly important because until 1988 Texaco did not have a formal job posting system and instead relied on an informal, word-of-mouth system in which recommendations, and the assistance of managers such as Davidson who knew when jobs were available, were crucial. (Tr. 112–13, 571, 593, 720) Matthews testified that Davidson said he was wasting his time in the effort to help plaintiff, and that Davidson could be of no help then or in the future. (Tr. 430–32) It bears mention that Davidson never denied the conversation with Matthews or gave any alternative description of it. Matthews' account of this emphatic and categorical rejection by Davidson could have been considered by the jury as evidence that Davidson, although according to his testimony he never employed plaintiff, barely knew her and was unacquainted with her conflicts over hiring at Texaco (Tr. 802–03), nonetheless had formed a strong negative view of plaintiff, and that this was based on plaintiff's general reputation as a disloyal employee. Certainly, the evidence at trial suggested no other reason why he would have such keen hostility toward plaintiff. The jury was further justified in concluding that based on this animus he would and did discourage any step that would further her career.

Plaintiff also asked Davidson to consider her for an executive secretary job, and disclosed to him also that she had complained during her tenure in the personnel office about particular employment practices. The conversation left Davidson "deeply troubled" and he dictated a memorandum about it into a small cassette recorder during his trip home that evening. (Tr. 816–17, 822–23)

Davidson had directed the hiring of Norma Cavanaugh, the successful candidate for the first job at issue, and used her first as a "floater" or unassigned secretary in the executive department so that she could be kept busy with challenging work and not sit idle. (Tr. 801, 834–35) Notably, he took no step to further plaintiff's career even though he knew of her desire to work as an executive secretary. He testified that he ruled out plaintiff based on negative appraisals from McCay (Tr. 819), but he added that he would not have considered the positive evaluations of plaintiff that appeared in her file even if he had known about them. Although he suggested that he had no need to consider such evaluations because he knew their authors personally (Tr. 844), the jury was free to conclude that his strongly expressed bias against plaintiff operated to her detriment. Davidson was consulted by John Ambler before the latter chose Norma Cavanaugh to be his secretary in mid–1981. (Tr. 802, 830)

Although Cavanaugh had a college degree which plaintiff lacked, there was a good deal of evidence from which the jury could have concluded that plaintiff was the superior candidate. At the time she was picked to be Ambler's secretary, Mrs. Cavanaugh was at salary grade 8, had been with Texaco for less than six months and had not worked for several years. (PX 257A, Tr. 801) Plaintiff at that time had been with the company for more than 16 years and had worked as an executive secretary at grades 11 and 12.

On the evidence summarized above, the jury could have found that in view of Texaco's informal procedure for placing secretaries, plaintiff's request to be considered for an executive secretarial position was a sufficient application for the job Norma Cavanaugh received and indeed the only kind of application plaintiff could have made. Moreover, the jury could have found that by the time Norma Cavanaugh was selected as Ambler's secretary, plaintiff's complaints while in the personnel office and her 1980 charge with the EEOC had marked her as an undesirable employee whom Texaco executives would neither promote nor place in a position of responsibility such that her skills could be displayed

and promotions earned as a result. Included in that calculus would be the jury's evaluation of the credibility of the witnesses. That finding in turn would support a jury conclusion that but for such retaliatory hostility, plaintiff would have been picked for the job that went to Norma Cavanaugh.

In September 1981, after plaintiff filed this action, Franklin W. Henley, a supervisor within Texaco Europe sent to Ambler a memorandum suggesting that plaintiff could no longer be trusted with sensitive information in view of the disloyalty to Texaco shown by her lawsuit. (PX 120) Although Ambler apparently disputed the conclusion that plaintiff should thenceforth be treated as a security risk (Tr. 785,927), he did not caution Henley against retaliation or otherwise discourage Henley from expressing the views espoused in his memorandum. (Tr. 786–88)

There was ample evidence from which the jury could have found that the Henley memorandum was simply the written manifestation of a view that pervaded Texaco after plaintiff filed her lawsuit, apart from whatever damage, if any, the memorandum itself may have caused. Thus, Matthews testified that when he approached one of plaintiff's former supervisors for help in finding her a position, he was told "no, there is nothing he could do." (Tr. 432)

James Knights, a retired Texaco employee, testified that Henley raised the issue of her lawsuit in 1981 and 1983, and questioned her suitability for sensitive work because of the lawsuit. (Tr. 400–01) He testified that in 1985 he called William Chukas of Texaco's Middle East/Far East Group in an effort to find a job for plaintiff, and was told initially that Chukas would review plaintiff's file. Thereafter, Chukas told Knights that in view of the lawsuit he would not consider plaintiff for a position within his group and advised Knights as follows: "a word to the wise, I wouldn't get your nose in Ms. Malarkey's problems." (Tr. 405) Although that incident followed by two years the retaliation the jury found with respect to the Eleonore Coronel position, it could have been taken by the jury to show the generality and intensity of the feeling within Texaco with respect to plaintiff and her lawsuit. That evidence was echoed in the testimony of other witnesses outside Texaco Europe, where plaintiff had worked. Ralph Mandia testified that he had heard "scuttlebutt" about plaintiff's "problem" and "complaints" in the early or mid–1980's. (Tr. 562–63) It was echoed as well in plaintiff's own testimony to the effect that she was told on more than one occasion that her lawsuit was impeding her career at Texaco. (Tr. 122–23, 955) The people alleged to have made those statements denied doing so (Tr. 914, 935, 985), but it was the jury's prerogative to believe plaintiff.

Plaintiff's qualifications were at least comparable to those of Eleonore Coronel, if not superior. In July 1983 Coronel was a grade 10 secretary who had been with Texaco for 10 years; plaintiff was a grade 11 secretary who had been with the company for about 20 years; neither woman had a college degree. (PX 257A)

Peter Bijur, the supervisor who hired Eleonore Coronel to be his secretary in July 1983, denied any recollection of plaintiff or knowledge of her lawsuit at the time he made his decision, and testified that plaintiff was not even among those considered for the job. (Tr. 691–98) Although mere disbelief of testimony by a fact finder is not enough to support an inference that the opposite is true, *Moore v. Chesapeake & Ohio Railway*, 340 U.S. 573, 576, 71 S.Ct. 428, 429, 95 L.Ed. 547 (1951), there was a good deal more than disbelief to support the jury's finding that Bijur retaliated, if the jury so found. Alternatively, as discussed above, there was also ample evidence from which the jury could infer that pervasive and purposeful retaliation kept plaintiff from being considered for the job, and that had she been considered she would have gotten it. Moreover, the evidence of persistent animus against plaintiff and her continued inability to find work within Texaco, with no evidence that anyone in authority intervened in her behalf, supports the conclusion that Texaco acted willfully.

Defendant argues that the Sixth Circuit's opinion in *Cesaro v. Lakeville Community School Dist.,* 953 F.2d 252 (6th Cir.1992) and this court's opinion in *Sorlucco v. New York City Police Dep't.,* 780 F.Supp. 202 (S.D.N.Y.1992) support a contrary result. They do not. The *Cesaro* court reversed a finding of Title VII liability because, unlike this case, the findings of the lower court established conclusively that the discrimination, if any, occurred before the process that resulted in the selection of another candidate and at a time when it was still possible for plaintiff to be selected by the final decision maker, a board that had no connection to or knowledge of the discriminatory decision. *Cesaro,* 953 F.2d at 255. In *Sorlucco,* the court found that there was no evidence to support the inference that those who decided to discharge plaintiff were aware that she had accused a male police officer of assaulting her. *Sorlucco,* 780 F.Supp. at 209. Both of those cases differ markedly from the case at hand, where there was evidence to support a finding of widespread antagonism against plaintiff within Texaco that admittedly had reached one decision maker and likely had reached another.

 Defendant insists also that the damage award was without basis. First, defendant requested no greater specificity as to damages than was provided in the verdict form, and should not be heard at this point to complain that it is difficult to see how the jury reached its damage computation. *See United States v. Maniktala,* 934 F.2d 25, 29–30 (2d Cir.1991) (failure to object to charge waives alleged defect, absent plain error). Second, defense counsel will recall that the jury's last note before it announced that a verdict had been reached included a request for a calculator, which was provided; this jury did not simply pluck a number from the air. Finally, plaintiff's counsel has provided a perfectly cogent hypothesis supporting the jury's award, based on a comparison of plaintiff's salary and Norma Cavanaugh's as disclosed by Plaintiff's Exhibit 257A, with appropriate percentages added for thrift plan contributions and pension benefits. (Plaintiff's Mem. in Opposition to Defendant's Motion for Judgment, pp. 15–18) That is enough to sustain the result here. *See Wickham Contracting Co. v. Local Union No. 3, IBEW,* 955 F.2d 831, 840 (2d Cir. 1992) (sustaining jury verdict based on plausible calculation not explicit in jury verdict).

On this record, I cannot say that a verdict in defendant's favor as to the two positions in question is the only result a reasonable and fair minded fact finder could have reached, or that the paucity of evidence to support either the verdict as to liability or the damage award compels the conclusion that the jury relied on mere surmise and conjecture in reaching it. Those findings would be necessary in order to grant defendant's motion. *Stubbs v. Dudley,* 849 F.2d 83, 85 (2d Cir.1988), *cert. denied,* 489 U.S. 1034, 109 S.Ct. 1095, 103 L.Ed.2d 230 (1989). Accordingly, defendant's motion for judgment must be denied.

## II.

 Defendant may be correct when it argues that prejudgment interest is not compulsory in a case such as this where the statute is silent on the subject, *EEOC v. County of Erie,* 751 F.2d 79, 81 (2d Cir.1984), but it is at least within this court's discretion to award such interest if that is necessary to fulfill the mandate of a statute intended to make plaintiff whole for the wrong she suffered. *Geller v. Markham,* 635 F.2d 1027, 1036 (2d Cir. 1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981). Indeed, the Second Circuit has reminded us recently that " 'it is ordinarily an abuse of discretion *not* to include prejudgment interest in a back-pay award....' " *Clarke v. Frank,* 960 F.2d 1146, 1154 (2d Cir.1992) (quoting *Donovan v. Sovereign Security, Ltd.,* 726 F.2d 55, 58 (2d Cir.1984) (emphasis in *Clarke*). The award of prejudgment interest generally is governed by a four-part test recently articulated by the Second Circuit as follows:

(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and relative equities of the award, (iii) the

remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. *Wickham*, 955 F.2d at 834. Within those general categories, the court should consider whether defendant acted innocently, whether plaintiff is responsible for the delay in the award, and the degree to which the damages in question are speculative. *Id.* at 834–36.

In this case, the jury found that plaintiff was a victim of retaliation that began in 1981. The statute is remedial and requires that plaintiff be made whole for her injury. Defendant was found to have acted willfully and thus could hardly allege that it acted innocently, even assuming without deciding that a defendant found to have retaliated could ever be said to have acted innocently. Plaintiff was diligent in seeking to remedy the alleged wrong, and the delay between the wrong and the judgment can not be ascribed to her.

Interest should be computed at the rate of 9% per annum, the statutory rate in New York. N.Y.Civ.Prac. L. & R. § 5004. Plaintiff has suggested a conservative method of computing interest in this case by determining plaintiff's salary shortfall for each year since 1981, taking 9% of that figure, and then multiplying that product by the number of years plaintiff was denied that salary. Those products are then added to produce a sum of interest. Plaintiff has assumed that interest is not compounded and that it is paid on the last day of each year, two premises that operate to defendant's benefit. Plaintiff's computation yields interest totaling $27,857.

Defendant has not challenged that computation, except to suggest that perhaps the jury included interest in its damage figure. Inasmuch as the jury was not told to include interest in its award, nor instructed as to the applicable interest rate or a method for computing interest, defendant's hypothesis arises from nothing but an enviably active fantasy life. Plaintiff will recover interest in the amount sought, $27,857.

### III.

Plaintiff seeks injunctive relief directing Texaco to promote her to grade 14, with her salary set at 90% of the maximum for that grade, and to refrain from future retaliation. Plaintiff bases her promotion and salary request on evidence that Norma Cavanaugh, who received the first promotion which the jury found plaintiff would have gotten but for retaliation, has been promoted to that grade, and that plaintiff consistently was paid at 90% of her grade level before Texaco retaliated against her. (PX 257A, p. 8; Tr. 206–07)

Texaco opposes this relief, arguing that plaintiff should receive at most the next available grade 10 position, corresponding to the grade level of the job she was found to have been denied as the result of retaliation, such level computed as of the time of the denial. Plaintiff is now a grade 11, so Texaco's preferred solution would accomplish the dubious feat of granting plaintiff relief in the form of a demotion, overlooking that had she obtained the job she wanted initially, and which the jury found was wrongfully denied her, it is at least arguable that she would have been in a better position not a worse position than she is in now. Texaco argues also that plaintiff should not receive 90% of the grade 14 salary because her attendance record was poor during a significant part of the time at issue during the trial, notwithstanding that plaintiff argues in response that many of her absences resulted from her adverse reaction to Texaco's retaliation.

Reduced to its essentials, Texaco's opposition to giving plaintiff anything else but the next grade 10 position available is that anything else necessarily would involve speculation. That is true as far as it goes, but it does not go far enough. Again, the age discrimination statute is a remedial statute whose point is to make whole the victims of conduct the statute forbids. *Whittlesey v. Union Carbide Corp.*, 742 F.2d 724, 727–28 (2d Cir.1984). Any uncertainty as to how far the remedy should reach in order to provide relief is the result of Texaco's unlawful retaliation; Texaco

should not be the beneficiary of that uncertainty. As Judge Weinfeld instructed,

> where one's conduct has prevented a precise computation of damages, the injured party is not to be deprived of adequate damages. The trier of the fact may draw reasonable inferences from relevant facts, and all doubts are to be resolved in favor of the injured party; the wrongdoer does not become the beneficiary of his own wrongful conduct.

*EEOC v. Kallir, Philips, Ross, Inc.,* 420 F.Supp. 919, 923 (S.D.N.Y.1976), *aff'd mem.,* 559 F.2d 1203 (2d Cir.), *cert. denied,* 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977).

The evidence relating to Norma Cavanaugh's employment history and plaintiff's own career before the unlawful retaliation justifies the grade 14 promotion and salary level plaintiff seeks.

Texaco opposes an injunction against future retaliation by noting that the jury found no retaliation in the failure to promote plaintiff as late as 1988, thereby necessarily finding that even if plaintiff was wronged in the distant past, she has not been wronged lately. Accordingly, defendant reasons, there is no need for an injunction extending into the future. In view of the evidence at trial, including the testimony of James Knights about the warning he received to keep out of plaintiff's problems, I prefer to err, if at all, on the side of caution. The requested injunction will issue.

## IV.

Plaintiff was represented at the outset of this litigation by the law firm of Spizz & Cooper. That firm moved in July 1989 for leave to withdraw. The motion was denied, but plaintiff in November 1989 secured the services of Denny Chin, Esq., then of the firm of Campbell, Patrick & Chin, who replaced Spizz & Cooper. The latter firm disbanded in August 1990, and Chin continued to represent plaintiff; he became affiliated with Vladeck, Waldman, Elias & Engelhard, P.C. ("the Vladeck firm") in October 1990, and has been a member of the firm since August 1, 1991. (Chin Aff. sworn to Jan 14, 1992 ¶¶ 7–9, 11, 18) Fee applications have been submitted by Spizz & Cooper, the Vladeck firm, and John W. Whittlesey, Esq., an attorney who avers with sworn support from plaintiff that he consulted with plaintiff during the period June 1, 1989 to October 13, 1989, apparently as plaintiff became dissatisfied with Spizz & Cooper and that firm moved to withdraw.

### A. General Principles

In order to assure that plaintiffs with worthy but monetarily small claims arising from denial of civil rights are not discouraged from seeking legal redress, the Equal Access to Justice Act provides that in an action to enforce civil rights statutes, "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988; *see Hensley v. Eckerhart,* 461 U.S. 424, 429, 103 S.Ct. 1933, 1937, 76 L.Ed.2d 40 (1983). Although the language of the statute seems merely permissive, there is "a presumption that successful civil rights litigants should recover reasonable attorney's fees unless special circumstances render such an award unjust." *DiFilippo v. Morizio,* 759 F.2d 231, 234 (2d Cir.1985).

Ordinarily, the proper measure for a fee award is "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate," *Eckerhart,* 461 U.S. at 433, 103 S.Ct. at 1939, the so-called lodestar amount, with the caveat that when plaintiff presses more than one claim, no fee may be awarded for services rendered in connection with an unsuccessful claim. *Id.* at 435, 103 S.Ct. at 1940. The Supreme Court cautioned that "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Id.* at 440, 103 S.Ct. at 1943. However, the Court also recognized that in cases involving related theories and facts counsel's time cannot be neatly segmented "on a claim-by-claim basis," and went on to hold that when multiple claims and alternative grounds are asserted "rejection of or failure to reach certain

grounds is not sufficient reason for reducing a fee." *Id.*

██ Moreover, the Second Circuit has held "a reduction made on the grounds of a low award to be error unless the size of the award is the result of the quality of representation." *Morizio,* 759 F.2d at 235. *See also Cowan v. Prudential Ins. Co.,* 935 F.2d 522 (2d Cir.1991) (barring strict reliance on the size of the damage award as a measure of attorneys' fees). Even an award of nominal damages would justify attorneys' fees if the nominal damages did not result from inadequate representation. *Fassett v. Haeckel,* 936 F.2d 118, 121–22 (2d Cir.1991) (per curiam). Therefore, "the appropriate question is whether the size of the award is commensurate with awards in [cases of the type under consideration] generally." *Morizio,* 759 F.2d at 235.

Although it appears from the Spizz & Cooper submission that plaintiff initially concluded a contingency fee arrangement with that firm, the award of attorney's fees need not be limited by that agreement. *Blanchard v. Bergeron,* 489 U.S. 87, 90, 95–96, 109 S.Ct. 939, 942, 945–946, 103 L.Ed.2d 67 (1989); *Cowan,* 935 F.2d at 526. Of course, a firm cannot recover twice.

## B. *Spizz & Cooper*

Plaintiff's former firm has applied for fees totaling $85,342.30 for representing her from 1981 until plaintiff retained successor counsel in 1989. It seeks compensation at the rate of $235 per hour for partner time and $150 per hour for associate time—its current preferred rates—for the entire period, even though the rates from 1981 to 1989 ranged from a low of $100 to a high of $225 per hour for partner time and a low of $50 to a high of $100 per hour for associate time. The firm justifies this application by suggesting that compensation at current rates would make up for interest that should otherwise be paid for fees incurred over the years.

██ Texaco has attacked the fee application on a broad front, notably for the substantial reversals suffered early in the litigation when plaintiff's sex discrimination, emotional distress and punitive damages claims were dismissed. *Malarkey v. Texaco, Inc.,* 559 F.Supp. 117 (S.D.N.Y.1982), *aff'd,* 704 F.2d 674 (2d Cir.1983). The Supreme Court said in *Hensley* that if a counsel's efforts "achieve[ ] only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." 461 U.S. at 436, 103 S.Ct. at 1941. That is true in this instance; accordingly, I have halved the time sought for the years 1981 through 1983.

██ Texaco disputes also the hourly rate sought by Spizz & Cooper, notwithstanding that the firm has not sought interest. Here, Texaco argues both that counsel's representation was not skillful and that the hourly rates sought by Spizz & Cooper, a Long Island firm, exceeds the rates sought by plaintiff's New York City firm, which competes in a more expensive market. I am at something of a disadvantage here; this case was not transferred to my docket until October 1990, and so it is difficult for me to evaluate the competence of a firm that had been replaced by then. Besides, the issue here is what Spizz & Cooper's services would command in the market; "it is not the function of judges in fee litigation to determine the equivalent of the medieval just price." *In re Continental Illinois Securities Litigation,* 962 F.2d 566, 568 (7th Cir.1992) (Posner, J.). The file, however, discloses a good deal of wasted effort in connection with discovery, some of which was due to defense counsel's scorched earth litigation technique but some of which can be placed at the door of Spizz & Cooper. Further, it is undeniable that Spizz & Cooper should have lower expenses and lower rates than plaintiff's current counsel; the latter both practices in a more expensive community and, expert in this type of litigation, can command a higher rate.

In addition, the intermittent fashion in which Spizz & Cooper spent time on the case necessarily contributed to inefficiency. Even taking account of Texaco's bankruptcy, which caused a long pause in 1987 and 1988, most of the time entries for other

periods reflect desultory rather than intensive activity, of a sort that is necessarily inefficient. Working on a case for an hour or two one day, and then returning to it days or weeks later for a short time virtually assures that time will have to be spent relearning details once known and then forgotten. Yet that is the pattern throughout the firm's representation. (Spizz Aff. Exh. C)

For the above reasons, Spizz & Cooper will recover at the rate of $175 per hour for partner time and $100 per hour for associate time. As to partners, that exceeds the rate charged through 1983; as to associates, it exceeds the rate charged through 1986. Although current rates may be used in order to compensate for delay in payment of fees previously earned, there is no requirement that such a formula be used. *Huntington Branch, NAACP v. Town of Huntington,* 961 F.2d 1048, 1049 (2d Cir. 1992) (and cases cited therein). The rate specified above is enough to compensate Spizz & Cooper for the delay in payment.

■ The firm has also included in its application the time it spent in 1989 moving unsuccessfully to withdraw as plaintiff's counsel, as well as the time it spent disengaging from the case after Chin took over as plaintiff's counsel. That is time spent fulfilling a professional obligation independent of the obligation to advance plaintiff's position in the underlying lawsuit. That time would not be properly billed to plaintiff absent a showing that plaintiff was in some way culpable in causing the time to be spent, and there has been no such showing here. Therefore, that time is not properly billed to Texaco, and I have subtracted in arriving at the total award specified below two partner hours and 18 associate hours from the time to be compensated for 1989.

Spizz & Cooper will be compensated for 174.55 hours of partner time and 187.82 hours of associate time, yielding $30,546.25 for partner time and $18,782 for associate time, plus $1487.50 for preparation of the fee application, for a total of $50,815.75. The firm has waived disbursements.

## C. *The Vladeck Firm*

Texaco would reduce the fees due the Vladeck firm on four grounds: plaintiff's limited success, plaintiff's unnecessary introduction of complexity into the case, inadequate documentation of time and expenses, and duplication of effort resulting from change of counsel. Only the last ground has merit.

■ Although plaintiff submitted nine age discrimination and nine retaliation claims to the jury, based on her failure to be placed in nine particular positions, and asserted before trial that numerous other positions were denied her, the jury rejected the age discrimination claims and found in her favor on only two of the nine retaliation claims. That, Texaco insists, was a "signal failure to succeed on almost all of [plaintiff's] claims [and] cannot be ignored by the Court in considering a reasonable attorneys' fee award." (Memorandum of Defendant Texaco Inc. in Opposition to Plaintiff's Applications, p. 8)

The age discrimination and retaliation claims in this case were entangled with one another. Proof of the same events was necessary in order to establish both. Thus, it would not have saved anything but a marginal amount of time for the case to have gone to the jury only on a retaliation theory rather than on both retaliation and age discrimination theories. Moreover, proof of a factual setting going back at least to 1976 was necessary in order to place later events in their proper perspective. Plaintiff's case rested on proving a pattern of behavior as much as any single incident or conversation. Finally, as plaintiff's counsel points out, plaintiff could not have held more than one position. Her recovery as to one position was about as much as she could have hoped for. That plaintiff initially sought extravagant sums in punitive and compensatory damages on theories later abandoned has already provided part of the basis for discounting the Spizz & Cooper fees. A double discount is unwarranted.

■ Nor can the Vladeck firm be taxed with having introduced needless complexity

into this case. Chin, and later the firm, came into a litigation that had been pending for eight years, and that was defended by Texaco to the last ditch and occasionally beyond. Discovery and other disputes abounded. That is not to criticize defense counsel, who have resolutely employed a particular style of defense. However, a defendant must recognize that a swarming defense entails the risk of provoking a swarming offense and the added costs that come with it.

■ Defendant's claim that fees and costs have been inadequately documented simply does not bear scrutiny, with the possible exception of $3015.99 of costs designated "miscellaneous," which I assume is comprised substantially of meals, which are not included in any other category. That category will be reduced to $2000. Defendant's other disputes over the documentation, particularly as to time charges, seem to have resulted more from an inability or unwillingness to understand what the records mean than from a deficiency in the records themselves.

■ Nor is there any substance to Texaco's claim that no fees should be recovered for time spent by Sharon M. Schroer, Esq., an associate at Chin's former firm who did not join the Vladeck firm. To the extent she did more than learn about the case, there is no reason to challenge Chin's representations that her efforts contributed to the outcome. In addition, it appears that she will be paid for her time notwithstanding that she has joined another firm. (Chin Reply Aff. ¶¶ 21–25) Despite Texaco's dark innuendo, of which the less said the better, I see nothing untoward in awarding fees for her time, except as set forth below.

■ Defendant's last objection, however, gives pause. As one would expect, when Chin took over the litigation, he and Schroer expended substantial time learning the case and its history. Texaco argues that it should not be required to pay for new counsel to learn what predecessor counsel already knew, and seeks a discount from Schroer's time although not from Chin's. The Vladeck firm argues that a

lawyer must learn a newly assumed case, that doing so helps the client, and that although Texaco's objection is "understandabl[e]," (Reply Memorandum of Law in Further Support at p. 23), the firm that succeeded at trial should not be penalized for that duplication. Implicitly, the Vladeck firm suggests that Spizz & Cooper bear that burden. No one has cited relevant authority on this subject, nor has independent research disclosed any, but for the reasons set forth below I decline to reach the result proposed by the Vladeck firm.

First, it seems apparent that Texaco should not bear the burden of duplicative work resulting from a change in plaintiff's counsel for which Texaco in no sense can be held responsible. Texaco's conduct may have necessitated plaintiff's retention of one law firm; it did not necessitate her retention of two.

That leaves three remaining parties— Spizz & Cooper, the Vladeck firm, and plaintiff herself. At the time Spizz & Cooper moved to withdraw, plaintiff apparently had objected to the way the firm was handling the case and expressed a loss of confidence in the firm. At that point, the firm acted consistent with its professional obligations in moving to withdraw. Both clients and lawyers could be severely hurt, and the administration of justice in civil cases impeded, by a rule that imposes a financial burden on the decision to sever the attorney-client relationship when the substance of that relationship makes such a severance advisable. Absent a clear showing that Spizz & Cooper acted in a way inconsistent with its professional obligations and thereby caused the relationship with its client to deteriorate, that firm should not be required to pay the costs associated with retaining successor counsel.

That leaves plaintiff and the Vladeck firm. Just as there has been no showing of fault by Spizz & Cooper in the deterioration of its relationship with plaintiff, neither has there been any showing that plaintiff herself was at fault. It is not unheard of that lengthy litigation of this sort generates ill will not only between adversaries

but also within the camps of the contending parties. Again, absent a clear showing that a plaintiff has acted unreasonably to undermine the attorney-client relationship, I believe it would be a mistake to craft a rule that binds a party to a lawyer in whom that party has lost confidence by imposing a cost on seeking new counsel.

That leaves the Vladeck firm, but more than a process of elimination recommends imposing this burden on them. Of all the actors in this scenario, it was only the Vladeck firm that had an informed and unfettered choice at the time the potential cost became apparent. Plaintiff, already years into the litigation, was represented by a firm she no longer felt comfortable with; Spizz & Cooper's position mirrored that of its client. The Vladeck firm, by contrast, could make an informed choice either to enter the litigation, or to walk away at no cost. That is not to say that the Vladeck firm should have been prescient and foreseen that it would be made to bear the cost of learning the case, but only that Chin at least was aware of the risk and was in the best position of all concerned to avoid it. In this situation, where there is no evidence that either plaintiff or her former firm is at fault, I believe that the sensible rule is to place the burden on the party that could most easily have avoided or mitigated the cost, either by not taking the case at all or by negotiating terms with the other parties. *Cf.* Guido Calabresi, *The Cost of Accidents* at 40–41 (1970). Accordingly, 100 hours will be subtracted from the time spent by Schroer; at $150 per hour, that yields a $15,000 reduction in the amount applied for.

For the above reasons, the Vladeck firm will recover a fee of $227,827.50, plus costs and disbursements of $28,470.45; in addition, the firm will recover a fee of $11,310 for time spent preparing reply papers in connection with plaintiff's application for prejudgment interest and injunctive relief, and the firm's own application for fees.

D. *Whittlesey*

 Plaintiff has submitted her own affidavit and that of John W. Whittlesey,

Esq. with whom she consulted in 1989 when she became disenchanted with Spizz & Cooper. He seeks compensation for 34 hours at $150, or a total of $5100. Texaco objects.

Whittlesey did not bill plaintiff because she was then unable to pay. (Malarkey Aff. Jan. 14, 1992, ¶ 3) Nor did he appear in the action or, so far as I can tell, have direct contact with any lawyer who did, although plaintiff avers that her case would never have survived without his ministrations during that critical period. (*Id.* at ¶ 5) Maybe so, but his reward in this world will have to be limited to plaintiff's gratitude and his own self-esteem. The potential for abuse in awarding fees in such circumstances is too obvious to require more than mentioning its existence, and this application accordingly is denied.

Plaintiff will settle on 10 days' notice a judgment embodying the above rulings.

SO ORDERED: