Antonio MARFIA, Plaintiff,

v.

T.C. ZIRAAT BANKASI, NEW YORK
BRANCH, Defendant,

and

Ozer Ozman, Individually and in his offi-
cial capacity as General Manager of T.C.
Ziraat Bankasi, New York Branch, De-
fendant.

88 Civ. 3763 (DC).

United States District Court,
S.D. New York.

Sept. 15, 1995.

Davis & Eisenberg by Herbert Eisenberg, Maria Savasta Kennedy, Robert B. Davis, New York City, for plaintiff.

White & Case by Glenn M. Kurtz, Cyrus Benson III, Laura B. Hoguet, New York City, for defendant T.C. Ziraat Bankasi.

**OPINION**

CHIN, District Judge.

On February 10, 1995, following a six-day trial in this employment case, the jury returned a verdict in favor of plaintiff Antonio Marfia ("plaintiff" or "Marfia") against defendant T.C. Ziraat Bankasi (the "Bank"), New York Branch, on his national origin discrimination, breach of contract and fraud claims. The jury awarded plaintiff $500,000 in back pay, $200,000 in front pay, and $100,000 for pain and suffering on the discrimination claim; $100,000 in damages on the breach of contract claim; and $700,000 in compensato-

ry and $1,000,000 in punitive damages on the fraud claim. The jury found in favor of the Bank with respect to plaintiff's claim of age discrimination.

Before the Court are the Bank's motion for judgment as a matter of law or for a new trial and plaintiff's motion for attorneys' fees, costs and prejudgment interest.

For the reasons that follow, the Bank's motion is denied, except to the extent that the damages award will be clarified to avoid any double recovery, and plaintiff's motion is granted to the extent set forth below.

### Summary of the Facts [1]

Marfia is a 53–year old man of Italian descent. (Tr. 55–56, 708).[2] He was employed by the Bank, which is headquartered in Turkey, in its New York Branch from January 1984 until May 29, 1987, when he was discharged. (Tr. 248, 709–10). At the time of his discharge, he held the title of Senior Vice President, was responsible for the treasury, retail banking, credit and operations departments of the New York Branch, and was "practically running" the New York Branch. (Tr. 192–94, 890; PX 10).

When he commenced his employment with the Bank in January 1984, plaintiff was paid an annual salary of $58,000. His annual salary was increased to $70,000 in August 1985 and to $73,850 in January 1987. He also received bonuses of $4,060 in September 1985, $2,080 in January 1986 and $3,692 in December 1986. (Tr. 710).

During his approximately three and a half years with the Bank, plaintiff performed his duties in more than a satisfactory manner. The operations of the New York Branch for which he was responsible made a profit of several million dollars. (Tr. 167–68, 195–202, 732). He received favorable performance reviews. (Tr. 93–94; PX 2, 3; see also PX 1). He was responsible for increasing the number of banks with which the New York Branch had correspondent relationships from

---

1. In reciting the facts herein, I have viewed the evidence in a light most favorable to plaintiff and granted him every reasonable inference that the jury might have drawn in his favor. *See* page 468 *infra.*

2. References to "Tr." are to the trial transcript and to "PX," "DX" and "JX" are to Plaintiff's Exhibits, Defendant's Exhibits and the Joint Exhibits, respectively, received in evidence at trial.

15 when he started to at least 50 within two years. (Tr. 87–88).

When Marfia was hired by the Bank, the General Manager of the Bank was Michael Baldwin. Ozer Ozman, a Turkish national, succeeded Baldwin as General Manager, becoming the person in charge of the overall business and internal affairs of the New York Branch, who was "authorized and empowered in the name and on behalf of the [B]ank to execute, authorize, and conduct all business matters related to the operations of the New York Branch." (Tr. 709, 710).

In June 1986, plaintiff received an offer of employment from the Iktisat Bankasi, a private bank in Istanbul. (Tr. 215–17). The offer was made in writing and provided for, among other things, a 30–month term, an annual salary of $65,000, plus living accommodations and a car for "business and private use." (PX 15). The offer was later improved to provide for a five-year term and a salary of $75,000 per year. (*See* PX 15; Tr. 217, 220).

With the offer from Iktisat Bankasi in hand, Marfia resigned from the Bank on or about July 1, 1986, effective July 31, 1986. (Tr. 218–19; JX 3). Marfia spoke with Ozman about his resignation, however, and Ozman tried to dissuade Marfia from accepting the Iktisat job. (Tr. 218). Ozman promised Marfia that he could stay at the Bank "the rest of [his] professional life," that he would be promoted to senior vice president, and that he would be given the position of general manager of a "newly opened" branch of the Bank. (Tr. 218). Ozman said to Marfia that at the Bank he would "feel[ ] secure" for "the rest of [his] professional life" while he would be with the Iktisat Bankasi for only five years. (Tr. 220). "With us you are here to stay," he said to Marfia. (*Id.*).

Ozman refused to accept Marfia's resignation. (Tr. 220). They continued the conversation at a social visit at Marfia's home that weekend. (Tr. 224–25). Ozman reiterated that "I'm not accepting this [resignation] letter, I had promised you that you will stay with us for your professional life." (Tr. at 225). Marfia believed Ozman, for Ozman "was the general manager. He was the power in the branch. Anything he had done up to then, recommended or proposed, had happened." (Tr. 225). On the basis of Ozman's promises and statements, Marfia rejected the offer from Iktisat Bankasi and remained with the Bank. (Tr. 218, 221–22; PX 16).[3]

In May 1987, John Bush was hired as Assistant General Manager of the New York Branch. (PX 11). As a result, certain of Marfia's functions were taken away from him, including the responsibility for dealing with correspondent banks; Marfia went to talk to Ozman about these organizational changes. (Tr. 246–47). It was at that point that Ozman said to Marfia: "I wanted a more ethnically acceptable individual in that position." (Tr. 247).

A few weeks later, Marfia was fired. Notwithstanding his excellent work record with the Bank over the years, Marfia was dismissed on May 29, 1987 by Ozman. (Tr. 710; JX 22). The reason articulated by the Bank was that Marfia had lost millions of dollars when he purportedly exceeded the New York Branch's foreign exchange trading limits in the fall of 1986. (Tr. 248–49). The jury was presented with substantial evidence, however, from which it could have reasonably concluded that the Bank's purported justification for dismissing plaintiff was pretextual.

First, Marfia himself testified that he did not exceed the Bank's trading limits. (Tr. 164, 228). Second, the Bank was aware of Marfia's trades as he was making them. Marfia testified that he consulted with Ozman several times before making the trades in question; that Ozman received daily and weekly reports of the trades made by plaintiff; that the head office of the Bank received trading reports; and that Ozman directed plaintiff, contrary to plaintiff's advice, to close the positions in question, which resulted in the losses in question. (Tr. 95–103, 207–09, 230–33, 319, 440–41; PX 76; JX 12). Third, if Ozman had felt that plaintiff's trades were improper, he could have ordered

---

3. Thereafter, however, in August 1986, Marfia spoke with Mr. Betiel of Iktisat Bankasi in New York. (Tr. 431). At that time, Iktisat "sweetened the offer." (Tr. 431–32). That night, Mrs. Marfia called Iktisat Bankasi to reject the offer on her husband's behalf. (Tr. 432).

plaintiff to close them much sooner than he did. (Tr. 942–43). Fourth, plaintiff's expert witness, Professor Ian Giddy, reviewed the trades in question and concluded (i) that the Bank had documentation relating to the trades as they were occurring and (ii) that the trades were not "spot" trades but were "forward" trades subject to a much higher trading limit, which plaintiff did not exceed. (Tr. 575, 578, 579, 603, 606–610).

The jury was entitled to find that in fact the Bank fired plaintiff because of his national origin. In addition to the evidence of pretext, plaintiff presented evidence that throughout his tenure with the Bank, Ozman made discriminatory comments to him. For example, just before Ozman became General Manager of the New York Branch, he stated to Marfia that he thought Michael Baldwin had "established" a "Cosa Nostra shop" at the New York Branch because Baldwin had hired a number of Italian–Americans as officers. (Tr. 177). Shortly after Ozman became General Manager, he told Marfia that the New York Branch "had gotten a reputation in the Street of being a Mafia shop, again because of so many Italian–Americans in positions of authority." (Tr. 179; *see also* Tr. 247). On several occasions, Ozman said to Marfia, "I want to Americanize ... the branch." (Tr. 183). Marfia also testified that Ozman said that "if he could run the branch with Turkish officers alone in the top positions, he would do so; since he could not run the bank with Turkish officers in top positions, because [there were not] enough of them, he wanted traditional Americans in those positions." (Tr. 254).

Approximately a week after being fired, plaintiff tried to commit suicide. Plaintiff's son, who was 15 years old at the time, found his father holding a loaded gun, but succeeded in pulling it away from him. Plaintiff was taken to the hospital, where he spent approximately two weeks on "suicide watch." (Tr. Tr. 255–62, 458–64). He was released, and eventually found new employment, with the New York State Banking Department, where he was still employed at the time of trial. (Tr. 265–67, 274–75).

## Procedural History

This case was commenced in May 1988 against both the Bank and Ozman. In 1989, Ozman failed to appear for his deposition and defendants failed to produce certain documents. Judge Duffy granted a motion to compel and ordered, among other things, Ozman to appear for his deposition. Ozman did appear for one day of his deposition, but he refused to complete it, and he also apparently destroyed certain documents. In October 1989, Judge Duffy entered a default against Ozman, "individually and in his official capacity as general manager of the bank." Thereafter, plaintiff moved for summary judgment against the Bank, relying on the default judgment entered against Ozman. Judge Duffy denied the motion.

After the case was reassigned to me, plaintiff made an application to use the default judgment against the Bank at trial. Plaintiff took the position that the only issue for trial was whether the Bank was responsible for Ozman's actions. The Bank essentially argued that the default judgment was meaningless, even though it had been entered against Ozman in both his individual and official capacities. I granted plaintiff's application in part, permitting certain "admissions" deemed to have been made by Ozman to be presented to the jury at trial, and instructing the jury to give the admissions as much weight, if any, as it deemed appropriate and requiring plaintiff to prove that the Bank had discriminated. *See Marfia v. T.C. Ziraat Bankasi,* 874 F.Supp. 560 (S.D.N.Y.1994).

At trial, the admissions were read to the jury. (Tr. 729–35). The jury was instructed that Ozman was "deemed to have admitted" the facts in question because he had "defaulted on his obligations in the lawsuit." (Tr. 730). The jury was further instructed to consider the "admissions" as evidence together with the other evidence in the case and to give the "admissions" "as much weight, if any," as it deemed "appropriate." (Tr. 730–31). The jury was cautioned that it still had to find that plaintiff had proven his claims against the Bank. (Tr. 731). During deliberations, the jury requested clarification, and a further explanation was provided. (Tr. 1106–08).

The jury returned its verdict on February 10, 1995, and these motions followed.

## Discussion

### A. The Bank's Motion

A jury verdict is not to be set aside and judgment entered as a matter of law pursuant to Fed.R.Civ.P. 50(b) unless " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [jurors] could have reached.' " *Samuels v. Air Transport Local 504,* 992 F.2d 12, 14 (2d Cir.1993) (*quoting Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)). In considering a Rule 50(b) motion, "a trial court must view the evidence in a light most favorable to the non-movant and grant that party every reasonable inference that the jury might have drawn in its favor." *Samuels,* 992 F.2d at 16. Judgment notwithstanding the verdict is to be entered only where there is such a "complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture." *Mattivi v. South African Marine Corp.,* 618 F.2d 163, 168 (2d Cir.1980); *accord Cruz v. Local Union No. 3,* 34 F.3d 1148, 1154 (2d Cir.1994).

A motion for a new trial pursuant to Fed.R.Civ.P. 59 may not be granted on the basis of the weight of the evidence unless the jury's verdict is "seriously erroneous." *Piesco v. Koch,* 12 F.3d 332, 344–45 (2d Cir.1993). A trial court may refrain from setting aside a verdict and ordering a new trial "[w]here the resolution of the issues depended on assessment of the credibility of the witnesses." *Metromedia Co. v. Fugazy,* 983 F.2d 350, 363 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993).

In challenging the jury's verdict in this case, the Bank makes essentially five arguments: (1) plaintiff failed to present sufficient evidence of pretext as to the Head Office; (2) no reasonable jury could have found for plaintiff on his breach of contract claim; (3) plaintiff's fraud claim is insufficient as a matter of law; (4) the jury's award of damages was excessive; and (5) plaintiff's counsel's purportedly improper closing warrants a new trial.

### 1. The Evidence of Pretext as to the Head Office

Arguing that plaintiff was discharged not by Ozman but by Sadik Kutlu of its Head Office, and arguing further that plaintiff presented no evidence to show that the Head Office discriminated, the Bank contends that the jury could not have reasonably concluded that the reason articulated by the Head Office for dismissing plaintiff—that he exceeded trade limits—was pretextual. (Def.Mem. at 4–7).[4] These arguments are rejected.

First, the jury could have reasonably concluded from the evidence that Ozman made the decision to dismiss plaintiff. As General Manager, Ozman was in charge of the overall business and internal affairs of the New York Branch, and was "authorized and empowered in the name and on behalf of the [B]ank to execute, authorize, and conduct all business matters related to the operations of the New York Branch." (Tr. 709, 710). The jury could have reasonably accepted Marfia's testimony that Ozman "was the power in the branch. Anything he had done up to then, recommended or proposed, had happened." (Tr. 225). Second, even assuming the decision was made by the Head Office, the jury could have reasonably found that Ozman influenced the Head Office, thereby "poisoning the well." *Crader v. Concordia College,* 724 F.Supp. 558, 564 (N.D.Ill.1989) (if decision-maker's sources of information about plaintiff are "polluted by racial bias, that might be enough to poison the well"); *see also Owens v. New York City Housing Authority,* 934 F.2d 405, 410 (2d Cir.) (offensive statements made by "individuals with substantial influence over [plaintiff's] employment" were sufficient to raise issue of fact on the issue of pretext), *cert. denied,* 502 U.S. 964, 112 S.Ct. 431, 116 L.Ed.2d 451 (1991). Third, the record contained evidence to show that the

4. References to "Def.Mem." are to the Bank's memorandum in support of its motion for judgment notwithstanding the verdict or alternatively for a new trial. References to "Pl.Mem." are to plaintiff's memorandum in opposition to the Bank's motion.

Head Office was kept advised of the trades engaged in by Marfia. Finally, plaintiff presented substantial evidence to show that in fact he had not exceeded trading limits. Hence, even assuming that the Head Office made the decision, the jury could have concluded that the Head Office's purported justification was pretextual.

### 2. The Breach of Contract Claim

■ The Bank next argues that the jury could not have reasonably found the employment relationship between plaintiff and the Bank was anything other than an "at-will." (Def.Mem. at 8). This argument is also rejected.

■ New York courts recognize that in certain limited circumstances, when an employer has expressly agreed to limit its right to discharge employees, it may no longer discharge employees at will. *See, e.g., Jones v. Dunkirk Radiator Corp.,* 21 F.3d 18, 21–22 (2d Cir.1994) (in determining whether " 'rebuttable presumption' " that employment is at-will may be overcome, " 'the *trier of the facts* will have to consider' the totality of the circumstances, including the writings, the situation, the course of conduct of the parties and their objectives"); *Yaris v. Arnot–Ogden Memorial Hospital,* 891 F.2d 51, 52 (2d Cir. 1989); *Cucchi v. New York City Off–Track Betting Corp.,* 818 F.Supp. 647, 649 (S.D.N.Y. 1993).

In *Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847 (2d Cir.1985), the Second Circuit held that in determining whether an employer has expressly agreed to limit its right to terminate at will, courts are to look at the "totality of circumstances." Specifically, the Court held in *Gorrill* that the viability of a claim for breach of contract is "not to be determined by application of a formula or checklist; instead the totality of facts ... must be considered." *Id.* at 853.

In the present case, plaintiff submitted sufficient evidence from which the jury could

have reasonably concluded that the Bank had expressly agreed to limit its right to terminate plaintiff's employment at will. Indeed, the jury could have reasonably found that the totality of circumstances showed that the Bank expressly agreed that it could discharge plaintiff only for "good cause." Those circumstances included the following:

First, the Bank's Administrative and Personnel Procedures Manual could fairly be read as requiring good cause to discharge an employee. Section 500 provided that "[t]he policies and procedures presented here have been established to ensure *equitable treatment for all employees* and to clearly define the Bank's policies for employees...." (JX 5 at TCZB 335) (emphasis added). Section 504B provided:

> Employees respect fair and firm discipline. Therefore, it is important that discipline be administered only for *just and good cause,* and that the discipline is appropriate for the offense.

(JX 5 at TCZB 362) (emphasis added). Since dismissal certainly is a form of discipline (*see* JX 5 at TCZB 366–67 (identifying "Release" as a type of discipline)), the Manual could reasonably be interpreted as requiring "just and good cause" to discharge an employee.

■ Second, section 504C of the Manual set forth a number of "Intolerable Acts" that required immediate dismissal. (JX 5 at TCZB 364–66). Other types of conduct were specified as to which discipline less severe than dismissal was prescribed. (JX 5 at TCZB 363–64). A categorical listing of reasons for termination of employment that omits discharge without cause can reasonably be construed as an express limitation on an employer's right to discharge without cause.[5] *See Kostaras v. United Airlines, Inc.,* 650 F.Supp. 576, 577 (S.D.N.Y.1986). *But see Cucchi,* 818 F.Supp. at 650–51 (language in company policy and procedures manual "as a matter of law cannot be construed as exclud-

---

5. The Manual apparently does not contain any disclaimer language advising employees that it is not a contract or stating that they were not at-will employees or stating that the Bank was reserving its right to discharge employees at will. (*See* Def.Mem. at 8–15 (identifying disclaimer

language in employment application but not in Manual)). While the Bank argues that plaintiff could not have relied on the Manual when he accepted the job offer from the Bank, he surely could have relied on it in 1986 when he turned down the job offer from Iktisat Bankasi.

ing other grounds for termination because it does not expressly do so").

Third, the Manual also set forth the Bank's "Non–Discrimination Policy." (JX 5 at TCZB 336). This section surely can be read as a contractual limitation on the Bank's ability to discharge employees for discriminatory reasons.

Fourth, as Sadik Kutlu testified (by deposition), plaintiff was "bound" by the Manual, as was "every employee in the New York Branch." (Tr. 704). The Manual had been approved by the Head Office and it set forth the procedures that governed personnel at the New York Branch. (Tr. 704–05; *see* Tr. 111–12, 711).

Finally, Ozman orally assured plaintiff that he could stay at the Bank the "rest of [his] professional life." While oral assurances by an employer are not by themselves sufficient to create an express limitation on the employer's right to discharge at-will, they are a significant factor that may be considered as part of the totality of circumstances. *Cucchi*, 818 F.Supp. at 652; *Sivel v. Reader's Digest, Inc.*, 677 F.Supp. 183, 186–87 (S.D.N.Y.1988); *see also Criado v. ITT Corp.*, 92 Civ. 3552 (LJF), 1993 WL 322837, at *3, 1993 U.S.Dist. LEXIS 11359, at *7 (S.D.N.Y. Aug. 16, 1993) (upholding a jury verdict of $250,000 for the plaintiff, where the totality of circumstances, including a handbook, a letter to employees, and oral assurances, showed an express limitation of the employer's right to discharge at will).

Hence, the jury was entitled to conclude, from the combination of the language of the handbook, Kutlu's deposition testimony, and the oral assurances made to Marfia, that the totality of the circumstances created an express limitation on the Bank's right to otherwise discharge him at will.

### 3. *The Fraud Claim*

The Bank also moves for judgment as a matter of law with respect to plaintiff's fraud claim, arguing (a) that the fraud claim is a "transparent repackaging" of plaintiff's lifetime employment contract claim, which I dismissed at the close of the evidence (Tr. 970–72), (b) that there was no evidence of fraudu-

lent intent on the part of the Bank, and (c) that there was insufficient evidence of reliance on the part of plaintiff. (Def.Mem. at 16–30). While this prong of the Bank's motion presents a closer question, it is nonetheless denied.

The fraud claim is not, in my view, a "transparent repackaging" of the contract claim that I dismissed. As I noted in denying the Bank's motion in this respect at trial (Tr. 974–75), plaintiff's fraud claim is separate and distinct from the lifetime contract claim. Whether or not there was an enforceable contract created binding the Bank to employ plaintiff for life, the jury could have reasonably concluded that Ozman made a promise to Marfia with a preconceived and undisclosed intention not to perform the promise.

Notwithstanding the Bank's suggestions to the contrary, the Second Circuit's decision in *Stewart v. Jackson & Nash*, 976 F.2d 86 (2d Cir.1992), is instructive. There, the defendant law firm was alleged to have made the representation that plaintiff "would head the environmental law department." *Id.* at 89. While the Court acknowledged that the representation "appear[ed], initially, to be a future promise," the Court concluded that the plaintiff's assertion that the firm, "at the time it made the promise, 'knew that it did not intend' to fulfill it," made the representation "an allegation of present fact which [gave] rise to a claim of fraudulent inducement." *Id.* (citing cases). *Accord Sabo v. Delman*, 3 N.Y.2d 155, 160, 143 N.E.2d 906, 908, 164 N.Y.S.2d 714, 716 (1957) ("while [m]ere promissory statements as to what will be done in the future are not actionable, ... it is settled that, if a promise was actually made with a preconceived and undisclosed intention of not performing it, it constitutes a misrepresentation of material existing fact").

Here, the jury was specifically charged that, to return a verdict in favor of plaintiff on the fraud claim, it had to find that "a promise was actually made with a preconceived and undisclosed intention of not performing it." (Charge Tr. 20). The jury obviously made such a finding, and that finding was supported by the evidence.

Marfia had a firm offer in hand from Iktisat Bankasi, and he had actually submitted a resignation letter to the Bank. It was then that Ozman made certain representations to plaintiff, upon which plaintiff testified that he relied in deciding to rescind his resignation and remain at the Bank. In view of the evidence of Ozman's animus toward plaintiff, including evidence that Ozman did not want plaintiff representing the Bank to the outside world, the jury was entitled to find that when Ozman made the promises to Marfia, he had no intention of keeping them. The jury could have reasonably concluded, from Ozman's statements regarding the "Cosa Nostra," a "Mafia shop" and "traditional Americans," that Ozman knew, when he promised plaintiff that he had a job at the Bank for the "rest of [his] professional life" that he did not mean it, and the jury could have reasonably inferred that Ozman knew then that it was only a matter of time before he got rid of plaintiff as part of his desire to "Americanize" the Branch. Of course, the jury also had before it Ozman's admission that "[a]t the time Ozman made the representations of employment for plaintiff's professional life, Ozman knew these representations to be false." (Tr. 734).

▌ As to the Bank's argument that there was no evidence of fraudulent intent on the part of the Bank, again, Ozman was the General Manager and thus the person responsible for the overall business and affairs of the New York Branch. Hence, the evidence of Ozman's fraudulent intent certainly could be considered by the jury as evidence of the Bank's fraudulent intent. *See, e.g., Citibank, N.A. v. Nyland (CF8) Ltd.,* 878 F.2d 620, 624 (2d Cir.1989) ("a principal is liable to third parties for the acts [including fraud] of an agent operating within the scope of his real or apparent authority").

▌ Finally, as to the Bank's argument that there was insufficient evidence of reliance, plaintiff specifically testified that on the basis of Ozman's "promises and statements," he rejected the offer from Iktisat Bank. (Tr.

218). The jury was entitled to credit this testimony. Moreover, even assuming, as the Bank argues, that plaintiff was not reasonably justified in believing that he had employment with the Bank for the rest of his life, he surely could have reasonably believed, based on Ozman's representations, that his job was sufficiently secure that he could refuse the job offer from Iktisat Bankasi.

### 4. *Damages*

The Bank argues that the jury's damages award is excessive and requires modification. First, the Bank contends that the damages award is duplicative and should be modified to eliminate any duplicate recovery. Second, the Bank argues that there was no basis for an award of punitive damages, and that even assuming there was such a basis, the award of $1 million in punitive damages is excessive.

I agree that the jury's verdict must be clarified to eliminate any double recovery. Indeed, the jury was instructed not to concern itself with the danger of a double recovery and it was instructed that any award of damages would be adjusted at a later date to eliminate any double recovery.

I will enter judgment for compensatory damages in the amount of $800,000, consisting of $500,000 for back pay, $200,000 for front pay, and $100,000 for pain and suffering. The jury's award of $100,000 for damages with respect to the breach of contract claim is duplicative of the jury's award on the discrimination claim.[6]

Likewise, the jury's award of $700,000 in compensatory damages on the fraud claim is duplicative of the jury's back pay and front pay awards on the discrimination claim. Plaintiff argues that a portion of the damages award on the fraud claim is distinct from the damages awarded by the jury on the other claims, and contends that he should be awarded $434,652 in fraud damages in addition to the damages awarded on the dis-

---

**6.** Plaintiff argues that the damages award on the breach of contract claim should be increased to equal the jury's award of $700,000 for back pay and front pay. (Pl.Mem. at 20). Since I am

entering judgment in the amount of the jury's award on the discrimination claim, I do not reach this issue.

crimination and breach of contract claims. (Pl.Mem. at 27–28).

I disagree. I am not persuaded that the jury intended to award plaintiff any additional compensatory damages on the fraud claim beyond what it awarded on the discrimination claim, and I am not convinced that the fraud caused any greater damages than the discrimination. Indeed, the jury was instructed that in calculating a damages award it was to seek to "make [plaintiff] whole." I believe that the jury felt it was making plaintiff whole by awarding him $500,000 in back pay, $200,000 in front pay and $100,000 for pain and suffering.

■ As to the award of punitive damages, the jury's verdict will be upheld. First, plaintiff did submit sufficient evidence to support an award of punitive damages. The jury was charged that it could award punitive damages only if it found that plaintiff had proven his fraud claim, and further only if it found that defendant's misrepresentations were made "maliciously or wantonly." (Charge Tr. at 29). The jury was charged that an act was malicious "if it is accompanied or motivated by ill will towards plaintiff" and that an act was "wanton if it is done in reckless or callous disregard of or indifference to the rights of plaintiff." (Charge Tr. at 29–30). *See Action S.A. v. Marc Rich & Co.,* 951 F.2d 504, 509 (2d Cir.1991) ("Under New York law, punitive damages are appropriate in cases involving 'gross, wanton, or willful fraud or other morally culpable conduct.' . . . Such conduct need not be directed at the general public.") (*quoting Borkowski v. Borkowski,* 39 N.Y.2d 982, 355 N.E.2d 287, 387 N.Y.S.2d 233 (1976); other citations omitted); *Ostano Commerzanstalt v. Telewide Systems, Inc.,* 880 F.2d 642, 649 (2d Cir.1989) ("punitive damages may be awarded when fraud is gross, wanton, or wilful, whether or not directed at the public generally").

Here, the jury could have reasonably found that Ozman's actions were wanton or malicious, or accompanied by ill will toward plaintiff, or engaged in with reckless or callous disregard for plaintiff's rights. The jury could have reasonably concluded from the evidence in the record, for example, that Ozman wantonly or maliciously induced plaintiff to turn down a five-year employment contract knowing that it was only a matter of time before the Bank fired him. The jury surely could have reasonably inferred ill will or callousness on the part of Ozman from the many discriminatory comments he made about plaintiff's Italian heritage and the evidence that Ozman intended to deceive plaintiff.

■ Second, the amount of punitive damages awarded by the jury—$1 million—is not excessive. *Racich v. Celotex Corp.,* 887 F.2d 393, 397 (2d Cir.1989) ("under New York law, the decision to award punitive damages and their amount are questions which primarily reside in the jury's discretion"). The Bank's suggestion that the New York Branch should be treated as an entity separate and distinct from the Head Office is rejected. Again, the Head Office was kept apprised of the events transpiring in the New York Branch, and Ozman was required to report to the Head Office. Moreover, the Head Office selected Ozman as the general manager of the New York Branch and put him in charge of the Branch's business and affairs. Hence, since Ozman had the authority to talk to Marfia about his future employment with the Bank, the Head Office was responsible for Ozman's actions in that respect. *Loughry v. Lincoln First Bank, N.A.,* 67 N.Y.2d 369, 378, 494 N.E.2d 70, 74, 502 N.Y.S.2d 965, 969 (1986) ("punitive damages can be imposed on an employer for the intentional wrongdoing of its employees only where management has authorized, participated in, consented to or ratified the conduct giving rise to such damages, or deliberately retained the unfit servant"). Finally, since the evidence showed that the Head Office had made deposits to the New York Branch in excess of $150 to 200 million (Tr. 106–07), and in view of the dollar amounts of the transactions in question (*see* Tr. 167–68, 596–97, 626–28) and the fact that the Bank has some 1,200 branch offices and 40,000 employees throughout the world (Tr. 685), the award of $1 million in punitive damages was not unreasonably high.

### 5. *Plaintiff's Counsel's Summation*

Finally, the Bank attacks the jury's verdict by arguing that plaintiff's counsel's "highly

improper" summation inflamed the jury. (Def.Mem. at 40–45). In particular, the Bank complains that plaintiff's counsel improperly commented on the absence from trial of Ozman, Kutlu and Erson Gokeman, improperly interjected his personal opinions, and mischaracterized the evidence.

■ The Bank's complaints in this respect, however, come too late. Although the Bank's counsel did object four times during plaintiff's summation (Tr. 1043, 1047, 1060–61), and although counsel did request a clarifying instruction at the close of summations (Tr. 1064), he did not object or request a curative instruction with respect to any of the statements now in question. Hence, even assuming some of the statements were overzealous, the Court did not have a "timely opportunity to cure the alleged overzealousness of [Marfia]'s attorney." *Matthews v. CTI Container Transport Int'l Inc.*, 871 F.2d 270, 278 (2d Cir.1989); *accord Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 385 (8th Cir.1992) (holding that it was counsel's "responsibility" to note exceptions to purportedly improper statements in closing argument and to request "some curative or remedial action by the court before the case was submitted to the jury"); *see also Racich*, 887 F.2d at 399 (where party fails to object to purportedly improper remarks in closing argument, to be able to raise the issue on appeal it must show that the "remarks were so inflammatory as to constitute plain error").

■ Moreover, while I might very well have sustained an objection to some of the statements in question or given a curative instruction, I do not believe the statements were so improper as to warrant a new trial in any event. As the Second Circuit has recognized:

> Trial courts possess broad discretion to determine when the conduct of counsel is so improper as to warrant a new trial. Not every improper or poorly supported remark made in summation irreparably taints the proceedings; only if counsel's conduct created undue prejudice or passion which played upon the sympathy of the jury, should a new trial be granted.

*Matthews*, 871 F.2d at 278. In my view, plaintiff's counsel's comments in summation did not "irreparably taint[ ] the proceedings."

The only comments made by plaintiff's counsel that warrant any further discussion are the comments relating to Ozman's absence from trial. As the Bank pointed out, Ozman did offer to travel to the United States to testify at trial; plaintiff objected, and I sustained the objection. *Marfia v. T.C. Ziraat Bankasi*, No. 88 Civ. 3763 (DC), slip op. at 2, 4, 6 (S.D.N.Y. Jan. 26, 1995). The Bank now argues that it was wrong for plaintiff's counsel to complain in summation about his inability to cross-examine Ozman when Ozman offered to make himself available at trial.

The Bank's arguments are meritless. Ozman defaulted on his obligations in discovery, and a default judgment was entered against him, both individually and in his official capacity. Ozman never moved to set aside the default judgment, and he never offered to cure his default. I had ruled prior to trial that he would not be permitted to testify because of the default judgment against him. *See id.* Hence, his belated offer, made on the eve of trial, to travel to the United States to testify was disingenuous. Moreover, in context, plaintiff's counsel's comments regarding Ozman's absence did not irreparably taint the proceedings because the jury was fully aware of the circumstances surrounding Ozman's absence, and plaintiff's counsel's comments clearly were based on the fact that Ozman was unavailable because he had defaulted on his obligations in discovery. (*See* Tr. 729–35; 1106–08).

## B. *Plaintiff's Motion*

### 1. *Prejudgment Interest*

■ Plaintiff seeks prejudgment interest on the damages awarded by the jury. The injuries for which the jury awarded Marfia compensation were first sustained in 1987. As the Supreme Court has noted, money received today for services provided previously is not equivalent to the same dollar amount had it been received at the time the services were provided. *Missouri v. Jenkins*, 491 U.S. 274, 283, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989). For this reason, the

Supreme Court has held that prejudgment interest is an element of complete compensation. *West Virginia v. United States*, 479 U.S. 305, 310, 107 S.Ct. 702, 706, 93 L.Ed.2d 639 (1987); *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655–56, 103 S.Ct. 2058, 2062, 76 L.Ed.2d 211 (1983). Indeed, while the award of prejudgment interest is a matter for the trial court's discretion, the Second Circuit has observed that " 'it is ordinarily an abuse of discretion *not* to include prejudgment interest in a back-pay award....' " *Clarke v. Frank*, 960 F.2d 1146, 1154 (2d Cir.1992) (*quoting Donovan v. Sovereign Security, Ltd.*, 726 F.2d 55, 58 (2d Cir.1984)). In the present case, I believe that Marfia is entitled to an award of prejudgment interest on the compensation he would have received but for the Bank's wrongful conduct.

The Bank argues that plaintiff should be denied prejudgment interest because the jury's award of $500,000 in back pay "may very well include interest." (Def. Fees Mem. at 19).[7] The Bank speculates that the jury may have included interest because in summation plaintiff's counsel asked for $398,000 in back pay, indicating that he was being conservative because the amount requested "doesn't talk about interest." (*Id.* at 19, citing Tr. at 1061).

The Bank's speculation is rejected. While plaintiff's counsel's reference in his summation to interest was ill-advised, in context I do not believe the reference caused the jury to factor in prejudgment interest. Plaintiff's counsel's estimate of $398,000 in back pay was based on an assumption of 7% pay increases over "7 some-odd years." (Tr. 1061). Plaintiff's counsel also told the jury in summation that plaintiff "might have gotten bigger raises. It [the $398,000 figure] doesn't talk about bonuses. He got bonuses. You have got it in the record." (*Id.*). Since the jury was not instructed to add interest,[8] it is

more likely that the jury either utilized salary increases greater than 7% or factored in bonuses.

I agree with the Bank, however, that prejudgment interest should not be awarded with respect to the front pay and pain and suffering awards. Hence, prejudgment interest will only be awarded on the $500,000 back pay award.

Interest will be computed at the rate of 9% per annum, the statutory rate in New York. N.Y.C.P.L.R. § 5004; *see Malarkey v. Texaco, Inc.*, 794 F.Supp. 1237, 1243 (S.D.N.Y. 1992), *aff'd*, 983 F.2d 1204 (2d Cir.1993). To simplify the calculations, I will divide the $500,000 back pay award evenly over the eight-year period following plaintiff's dismissal on May 29, 1987, and I will assume that each installment should have been paid on the last day of each year.[9] Hence, interest will be calculated as follows:

| Amount | Due Date | No. of Days to 9/15/95 |
|--------|----------|------------------------|
| $62,500 | 5/29/88 | 2,664 |
| $62,500 | 5/29/89 | 2,299 |
| $62,500 | 5/29/90 | 1,934 |
| $62,500 | 5/29/91 | 1,569 |
| $62,500 | 5/29/92 | 1,204 |
| $62,500 | 5/29/93 | 839 |
| $62,500 | 5/29/94 | 474 |
| $62,500 | 5/29/95 | 109 |

Total No. of Days: 11,092

At 9% per annum, the per diem rate for $62,500 is $15.41, which multiplied by 11,092 days equals $170,927. Hence, prejudgment interest in the amount of $170,927 will be awarded.

### 2. *Attorneys' Fees*

The usual method for determining the amount of fees to be awarded a prevailing plaintiff in a civil rights case is to start by

---

7. References to "Pl.Fees.Mem." and "Def.Fees Mem." are to plaintiff's memorandum in support of his fees application and defendant's memorandum in opposition thereto, respectively.

8. In contrast, the jury was instructed that if it awarded plaintiff front pay for future monetary losses, it would have to determine "the present value or worth in dollars of such future earnings." (Charge Tr. 25).

9. These assumptions operate to the Bank's benefit, since in fact the wages should have been paid throughout the year and not on the last day, and since the annual amounts early on (when plaintiff was unemployed) were higher. In addition, I have not compounded interest.

computing the "lodestar," the number of hours reasonably expended multiplied by a reasonable hourly rate, and to then make any appropriate adjustments. *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 944, 103 L.Ed.2d 67 (1989); *Hensley v. Eckerhart*, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 1939 n. 7, 76 L.Ed.2d 40 (1983); *Cowan v. Prudential Ins. Co. of Am.*, 935 F.2d 522, 524 (2d Cir. 1991).

Davis & Eisenberg (the "Firm") seeks compensation for approximately 938 hours expended by Herbert Eisenberg, Esq. at an hourly rate of $250, approximately 116 hours expended by Robert B. Davis, Esq. at an hourly rate of $225, approximately 174 hours expended by Jill Hanekamp Zier, Esq. at an hourly rate of $185, and approximately 258 hours for Maria Savasta Kennedy, Esq. at an hourly rate of $185, for a total of 1,486 hours and an aggregate fee award requested of (rounding off the numbers) $340,520. The total of 1,486 hours reflects a 10% reduction proposed by plaintiff's counsel to account for time expended on the common law claims for which attorneys' fees are not available (Eisenberg First Decl. ¶ 9) and the addition of some 27.75 hours for work performed in connection with the discrimination claim after March 10, 1995 (when the Firm submitted its moving papers). Plaintiff's counsel has represented that additional time was spent on the case for which compensation is not being sought. (Eisenberg First Decl. ¶ 11; Eisenberg Second Decl. ¶¶ 3, 4).

The Bank opposes the fee application in two principal respects. First, it contends that plaintiff's attorneys are seeking compensation for a "patently excessive" and "patently unreasonable" number of hours. (Def. Fees Mem. at 1, 3). In particular, the Bank contends that this "straightforward, single plaintiff discrimination action" did not require 1,600 hours of work, and argues that the hours for which compensation is awarded should be reduced to account for (i) non-compensable time spent on the common law

claims and unsuccessful age discrimination claim, (ii) duplicative efforts and the attendance of two of plaintiff's attorneys at depositions and trial, (iii) "blatant inefficiency and wasted time," and (iv) "vague and ambiguous" time entries. (*Id.* at 4–11). The Bank contends that "at least 50%" of the Firm's time on the case should be allocated to the non-compensable common law claims. (*Id.* at 7).

Second, the Bank challenges the reasonableness of the rates requested by plaintiff's attorneys, noting, for example, that Eisenberg should not be awarded "the highest hourly rate that he now receives [$250] when most of the work he performed [in this case] was at the beginning of his career." (*Id.* at 14).

I will deal with the two issues in reverse order.

### A. *The Hourly Rates*

As the Bank acknowledges (Def. Fees Mem. at 14), I have previously entertained a fee application from the Firm. Messrs. Eisenberg and Davis represented the plaintiff in the first case I tried following my appointment to the bench, and after their client prevailed at trial, I awarded the Firm attorneys' fees of $81,824.25, applying hourly rates of $250 for Eisenberg and $225 for Davis. *Altman v. Port Authority*, 879 F.Supp. 345, 353–54 (S.D.N.Y.1995).

The Bank has articulated no persuasive reason for me not to apply the same rates in this case, and for the reasons set forth in *Altman*, I will utilize hourly rates of $250 and $225 for Eisenberg and Davis, respectively, for I find that these rates are well "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 1547 n. 11, 79 L.Ed.2d 891 (1984). *See Altman*, 879 F.Supp. at 353–54.[10]

---

**10.** *See, e.g., Helbrans v. Coombe*, 890 F.Supp. 227 (S.D.N.Y.1995) (in Religious Freedom Restoration Act case, hourly rates awarded of $350 for experienced solo practitioner and for lawyers affiliated with 25–attorney New York City firm as follows: $300 for senior partners; $250 for jun-

ior partners; $225 for senior associates; $175 for mid-level associates; and $125 for junior associates); *Ragin v. Harry Macklowe Real Estate Co.*, 870 F.Supp. 510, 518–19 (S.D.N.Y.1994) (in housing discrimination case, hourly rates of $275 and $300 for lead counsel); *Davis v. City of New*

The rate of $185 proposed for both Zier and Kennedy warrants some brief discussion. Kennedy, an associate with the Firm, tried the case as a second seat to Eisenberg. She has been a practicing attorney for some seven years. An hourly rate of $185 was utilized by the court in awarding attorneys' fees for her work in an environmental case, *Natural Resources Defense Council v. Babbitt*, No. C–93–0301 (MHP), 1994 WL 361811 (N.D.Cal. July 1, 1994). Zier was associated with the Firm from July 1992 until March 1994, when she relocated to Kentucky. She has been practicing law for some five years. I will accept the proposed rate of $185 an hour for Kennedy, but I will apply a rate of $150 an hour for Zier, who has two years less legal experience than Kennedy.

Two observations are worth making in response to the Bank's arguments about the hourly rates. First, the Bank argues that "[t]he courts in this jurisdiction have often limited the rates of very experienced attorneys in cases such as the one at bar to $200 per hour." (Def. Fees Mem. at 12–13, citing cases). None of the twelve cases cited, however, was decided recently.[11] The prevailing rates in the community for lawyers experienced in the employment field have increased in recent years, in part in recognition of the complicated, evolving nature of this area of law. Significantly, many employers in recent years have turned to the large law firms—such as the Bank's present counsel—to represent them in employment discrimination cases. It would be incongruous to limit plaintiffs' counsel in these cases to an hourly rate of $200 or less when defendants' counsel, in defending the very same cases, are commanding rates of up to $400 an hour (or more) for partners. *But see Williams v. Secretary of Navy*, 853 F.Supp. 66, 71 (E.D.N.Y.1994) (in allowing hourly rate of

$275 for plaintiff's counsel, court rejected comparison of plaintiff's counsel's rates to rates charged by "firms such as Paul, Weiss, Rifkind, Wharton & Garrison" because of the "high expenses associated with maintaining large offices").

■ Second, as to the Bank's observation that Eisenberg should not be paid at a rate of $250 per hour because he commenced this action seven years ago and "within his first four years as an attorney" (Def. Fees Mem. at 14), that fact supports utilizing the higher rate. With the exception of a "small initial retainer," plaintiff's attorneys have not been paid any fees since this case was commenced some seven years ago. (Pl. Fees Mem. at 4). As the Supreme Court has held:

> Our cases have repeatedly stressed that attorney's fees awarded under [42 U.S.C. § 1988] are to be based on market rates for the services rendered.... Clearly, compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings. We agree, therefore, that an appropriate adjustment for delay in payment—*whether by the application of current rather than historic rates or otherwise*—is within the contemplation of the statute.

*Missouri v. Jenkins*, 491 U.S. 274, 283–84, 109 S.Ct. 2463, 2469, 105 L.Ed.2d 229 (1989) (citations and footnote omitted; emphasis added). In the present case, application of the current rate is "an appropriate adjustment" for the delay in payment.

### B. *The Number of Hours*

At the outset, I note that the number of hours spent on this case by plaintiff's counsel

---

*Rochelle*, 156 F.R.D. 549, 558 (S.D.N.Y.1994) (in voting rights case, hourly rate of $300 for lead counsel); *Loper v. New York City Police Dep't*, 853 F.Supp. 716, 720 (S.D.N.Y.1994) (in civil rights challenge to anti-loitering statute, hourly rate of $250 for a "sole practitioner" of "intermediate experience," *i.e.*, seven years out of law school); *Williams v. Secretary of Navy*, 853 F.Supp. 66, 71 (E.D.N.Y.1994) (in employment discrimination case, hourly rate of $275 for partner); *Caruso v. Peat, Marwick, Mitchell & Co.*, 779 F.Supp. 332, 334 (S.D.N.Y.1991) (in employ-

ment discrimination case, hourly rates of $175 to $300 for partners); *Pierce v. F.R. Tripler & Co.*, 770 F.Supp. 118, 119 (S.D.N.Y.1991) (in employment discrimination case, hourly rates of $200 to $300 for partners), *aff'd in relevant part and rev'd in part*, 955 F.2d 820 (2d Cir.1992).

**11.** Indeed, of the twelve cases cited, one was decided in 1988, three in 1990, two in 1991, four in 1992 and two in 1993.

was not "patently excessive" or "patently unreasonable," as the Bank alleges, nor was this a "straightforward . . . discrimination action." (Def. Fees Mem. at 1, 3, 4). Indeed, the case has been litigated for over seven years. While I did not start supervising the case until October 1994, I could see that the case had been vigorously litigated before it was reassigned to me, and the parties continued to litigate it vigorously thereafter. There was substantial discovery taken, and thousands of pages of documents exchanged. According to plaintiff's counsel, there were ten days of depositions; plaintiff was deposed for three days. The parties briefed *eight* motions prior to trial, and other motions were made during and after trial. And of course, a joint pretrial order was prepared and the trial itself took six days (not counting the day the jury rendered its verdict).

In addition, the case presented a number of unusual issues, most notably the extent to which plaintiff could utilize the default judgment entered against Ozman against the Bank. Moreover, while "handbook" and fraud claims are often pleaded in employment cases, few go to trial and even fewer result in judgments for plaintiffs. There were several complicated factual issues as well. Plaintiff's job as a foreign exchange trader, for example, required plaintiff's counsel to learn such concepts as "spot" and "forward" transactions, foreign exchange "swaps," "simultaneous spot transactions," trading limits, and buying and selling Japanese yen and German marks. Hence, it is not at all surprising that a substantial amount of time was required.

Finally, it is difficult to take significant issue with the number of hours put into the case by plaintiff's counsel when one looks at the end result. Plaintiff's counsel achieved a stunning victory, as the jury returned a verdict awarding plaintiff $800,000 in damages on his discrimination claim, $100,000 on his contract claim, and $1.7 million on his fraud claim.

In terms of certain of the Bank's specific arguments, I note the following. First, Marfia's lack of success on his age discrimination claim should not result in any reduction of fees. *See Hensley v. Eckerhart,* 461 U.S.

424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983); *City of Riverside v. Rivera,* 477 U.S. 561, 571, 106 S.Ct. 2686, 2692, 91 L.Ed.2d 466 (1986). In *Hensley,* the Court held that in cases involving "a common core of facts" or related legal theories, counsel's time will be "devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis." 461 U.S. at 435, 103 S.Ct. at 1940. The Court held that in such a case, where a plaintiff has obtained excellent results, his or her attorney should be fully compensated. The Court observed:

> In these circumstances, the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants may in good faith raise alternative grounds for a desired outcome, and the court's *rejection of or failure to reach certain grounds is not sufficient reason for reducing a fee.*

*Id.* (citations omitted) (emphasis added); *accord Lunday v. City of Albany,* 42 F.3d 131, 134–35 (2d Cir.1994) ("So long as the plaintiff's unsuccessful claims are not 'wholly unrelated' to the plaintiff's successful claims, hours spent on the unsuccessful claims need not be excluded from the lodestar amount. . . . [W]e consistently have resisted a strict proportionality requirement in civil rights cases.") (citations omitted).

Second, the Bank's argument that Marfia should not be reimbursed for the participation of two attorneys at depositions and at trial is also rejected. The Bank itself utilized two attorneys at trial. Moreover, as Judge Tenney has held,

> The use of multiple attorneys . . . is not unreasonable per se. Indeed, division of responsibility may make it necessary for more than one attorney to attend activities such as depositions and hearings. Multiple attorneys may be essential for planning strategy, eliciting testimony or evaluating facts or law.

*Williamsburg Fair Hous. Committee v. Ross–Rodney Hous. Corp.,* 599 F.Supp. 509, 518 (S.D.N.Y.1984) (citations omitted); *accord New York Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1146 (2d Cir. 1983) ("prevailing parties are not barred as a

matter of law from receiving fees for sending a second attorney to depositions or an extra lawyer into court to observe and assist") (citation omitted).[12]

Third, the Bank's challenge to the adequacy of plaintiff's counsel's time records is rejected. I have reviewed the time records, and I find that they are adequate.

Notwithstanding the above, I believe some modest reductions should be made in the number of hours for which fees are awarded. I have three areas of concern.

First, although plaintiff's counsel has proposed a 10% reduction to account for time spent on the non-compensable common law claims, I believe that figure is a little low. On the other hand, I do not agree with the Bank that "at least 50%" of the time should be allocated to those claims, for there was a "common core of facts." Most of the hours in question would have been required to litigate the discrimination claim in any event. For example, although the extensive evidence relating to whether plaintiff exceeded his trading limits was necessary to show the absence of "good cause" for the breach of contract claim and was also useful to support the fraud claim, the same evidence was critical to show "pretext" with respect to the discrimination claim. Nonetheless, the common law claims clearly presented substantial legal issues and some of the evidence probably would not have been required if the only claim in the case had been the discrimination claim.[13]

Second, I am persuaded that some of the time spent by plaintiff's counsel was excessive. In particular, some 177 hours were spent by plaintiff's counsel preparing plaintiff's unsuccessful motion for summary judgment against the Bank. Hence, some $43,-000 worth of time was spent on *plaintiff*'s

motion for summary judgment, which resulted in a three-sentence decision denying the motion.

Third, I believe a modest reduction is also appropriate to account for Kennedy's learning time following Zier's relocation to Kentucky. Presumably, had Zier not moved, she would have remained on the case and some of the time that Kennedy spent learning the case would not have been necessary. The Bank should not be penalized for this course of events. *See Malarkey v. Texaco, Inc.*, 794 F.Supp. at 1247. From reviewing her time records, however, it does not appear that Kennedy had to spend a lot of time in this respect.

On account of these three factors, I will reduce the hours for which plaintiff's counsel seeks payment by an additional 10% (*i.e.*, 10% of the hours remaining after plaintiff's voluntary reductions) as well as another 25 hours from Kennedy's time.

### C. Calculation of Fees

Hence, I will award fees as follows:

|  | Hours | Rate | Fees Awarded |
|---|---|---|---|
| Eisenberg | 845 | $250 | $211,250 |
| Davis | 105 | 225 | 23,625 |
| Zier | 157 | 150 | 23,550 |
| Kennedy | 208 | 185 | 38,480 |
|  | Total: |  | $296,905 |

### 3. Costs

Plaintiff also seeks reimbursement for $15,618 in litigation costs. The Bank objects, contending that the expenses should be reduced in the same proportion as the attorneys' fees, that insufficient description has been provided, and that the expert witness fees should be limited to $40 per day (for a total of $120) rather than the $7,487 requested. (Def. Fees Mem. at 17–18).

---

**12.** One court has found that the "presence of more than one attorney at a deposition or trial enhances efficiency," *Howes v. Medical Components, Inc.*, 761 F.Supp. 1193, 1199 (E.D.Pa. 1990), and another has acknowledged that "[u]se of more than one lawyer is common in legal practice. Consultation among lawyers ensures that they do not overlook significant facts or inquiries.... Two lawyers are the minimum in much private litigation." *Bohen v. City of East Chicago*, 666 F.Supp. 154, 157 (N.D.Ind.1987).

**13.** In fact, the cases provide that where there is a "common core of facts and related theories" and the issues are "intertwined factually," a "fully compensable fee award" is permissible, even when the plaintiff asserts pendent state claims. *Dague v. City of Burlington*, 935 F.2d 1343, 1358–59 (2d Cir.1991); *accord Valley Disposal, Inc. v. Central Vermont Solid Waste Mgt. District*, 872 F.Supp. 119, 125 (D.Vt.1994).

I will limit the expert witness fees to $120, as suggested by the Bank. *See West Virginia Univ. Hosps. v. Casey*, 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (expert witness fees may not be shifted to losing party under 42 U.S.C. § 1988); *Myree v. Local 41, Int'l Bhd. of Elec. Workers*, 847 F.Supp. 1059, 1066 (W.D.N.Y.) (expert witness fees disallowed in Title VII and Section 1981 case), *aff'd*, 29 F.3d 620 (2d Cir.1994). Although the Civil Rights Act of 1991 amended Title VII to permit the recovery of expert witness fees, 42 U.S.C. § 2000e–5(k), the 1991 Act does not apply to this case, where the events in question occurred in 1987 and suit was filed in 1988. *See Myree*, 847 F.Supp. at 1066 n. 7; *see generally Landgraf v. USI Film Products*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) (holding that provisions of 1991 Act did not apply to Title VII case pending when statute was enacted). Hence, I will disallow $7,367 of the amount requested for experts' fees, leaving $120 for which reimbursement will be permitted.

Of the $8,251 remaining, I believe that it would be appropriate to reduce that amount in roughly the same proportion that attorneys' fees were reduced, and thus I will reduce the costs by 20%, leaving a balance of $6,600 to be reimbursed. The Bank's remaining objections to insufficient documentation and excessiveness are rejected.

### Conclusion

In sum, viewing the evidence in the light most favorable to plaintiff and granting him every reasonable inference that the jury might have drawn in his favor, I find that the jury's verdict was not the result of "sheer surmise and conjecture," and I find further that its verdict was not "seriously erroneous."

Defendant's motion for judgment as a matter of law or for a new trial is denied, except to the extent that the jury's verdict has been clarified to eliminate any double recovery. Plaintiff's motion for prejudgment interest and attorneys' fees and costs is granted to the extent set forth above.

Judgment will be entered against the Bank and Ozer Ozman,[14] jointly and severally, as follows: $500,000 for back pay; $200,000 for front pay; $100,000 for pain and suffering; $1,000,000 in punitive damages; $170,927 for prejudgment interest on the back pay; $296,905 for attorneys' fees; and $6,600 in costs, for a total of $2,274,432.

SO ORDERED.

---

**14.** Some weeks after the trial was completed, new counsel appeared for Ozer Ozman and requested that a judgment for a sum certain be entered against him so that he could appeal. All parties thereafter agreed that judgment would be entered against Ozman in the amount of the final judgment entered against the Bank.